## Garrahan *v.* Glen Alden Coal Company, Appellant.

Argued March 6, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*J. H. Oliver,* with him *Franklin B. Gelder,* for appellant.

*Roger J. Dever,* for appellee.

OPINION BY RHODES, J., April 12, 1939:

The confused record in this workmen's compensation case requires that it be returned to the compensation authorities. Claimant, on behalf of herself and her minor child, filed a claim petition for compensation for the death of her husband, who was an employee of defendant, on March 15, 1935. In the answer filed by defendant it was averred that the death of deceased was not caused by an accident in the course of his employment, and that it occurred as a result of deceased's violation of the Anthracite Mine Law, Act of June 2, 1891, P. L. 176, as amended, and also of his violation of specific instructions issued by defendant. The first reason was not pressed, and reliance was placed on the violation of positive orders as taking deceased out of the course of his employment at the time he sustained his fatal injury. After hearing, the referee made an award in favor of claimant. Defendant appealed to the Workmen's Compensation Board, which affirmed the referee's findings of fact, conclusions of law, and the award. On appeal the court of common pleas affirmed the action of the board, and entered judgment on the award. This appeal by defendant followed.

Deceased was employed as a brakeman in defendant's mine. He and a fellow employee, a motorman, were in charge of an electric motor used for the purpose of taking empty coal cars from the foot of a slope to the various working places in one of the veins of the mine, and also taking loaded cars from those working places

to the foot of the slope. The empty cars were lowered and the loaded cars hoisted to an overlying vein by means of a slope which was about 3600 feet long. The method of operating the slope was rope haulage operated by an engine located at the top of the slope. Virtually parallel with, and about 50 feet distant from, the slope was another opening in which there were no tracks, and which was used by the employees of defendant in passing from one vein to the other. It was known as a manway. It contained no tracks as did the slope. As part of his duties at the end of his shift, deceased was required to disconnect three switches controlling the electric energy in the wires along which the trolley of the motor which he helped operate ran when working. None of the switches was in the slope; two of the switches were located in the manway about 1500 feet from the first switch which was located near the foot of the slope.

At the time of the accident a trip of five loaded cars was being hoisted up the slope. The runner (also designated in the testimony as a slopeman or planeman) was riding on the last car. When the trip had gone a distance of 1200 to 1500 feet up the slope the two front cars became derailed, and moved about 23 feet after derailment. After the cars were stopped the runner heard a moan, and found deceased lying on the bottom of the slope on the side farthest from the manway, and either under the overhanging of the derailed cars or between them and the side of the slope. Longitudinally the body was between the two derailed cars. The slope and the manway were connected by passageways which were for ventilating purposes. By using the opening between the slope and the manway lower than the point where the body was found the distance between this point and the manway switches was about 210 feet. By using the passageway above where the body was found the distance between that point and the switches was about 160 feet.

The material question in this case is whether deceased was traveling in the slope instead of the manway, at the time he was injured, in violation of the positive orders of defendant, and consequently not in the course of his employment.

A comparison of the findings of fact of the referee, all of which were affirmed by the board, with portions of the opinion of the board demonstrates the necessity for the reversal of the judgment, and the remittance of the record. The first eight findings of fact of the referee are printed in the margin.[1] The referee refused to find how deceased reached the point on the slope where he was found fatally injured. The board, after discussing the evidence, said that "the inference ...... is that the decedent was on his way up the slope to turn

[1] "1. On March 15, 1935, Martin Garrahan was employed by the Glen Alden Coal Company as a brakeman on a motor in the mines in the Woodward Colliery of the defendant company in Luzerne County at the average weekly wage of $30.96, and on said date was fatally injured in the said mines, and died on the same day leaving to survive him his widow, Stella Garrahan and a son Martin Garrahan, Jr., born on April 4, 1935.

"2. It appears from the testimony that the injured body of the decedent, Martin Garrahan, was found on an inclined slope at a point where two mine cars of a loaded five-car trip had jumped the track on and away toward the head of the slope.

"The body of the injured man, still alive, when found was lying between the mine tracks and the right hand side of the slope in the direction of the head of the slope and in a position between the two cars which had jumped the track.

"3. The runner on the trip, who rides on the rear of the same as it proceeds upwards toward the head of the slope discovered the prostrate injured body of Garrahan after the trip had stopped due to the derailment of the cars, and when he heard some moaning.

"The runner met the motorman of the motor on which the decedent worked as a brakeman, and who identified the body as that of Garrahan.

"When Garrahan was picked up at the point where he was found he complained of pain in his back.

off the switches in the manway." The board made no finding of fact based on this inference as it was its duty to do if the evidence warranted and it was believed *(Vorbnoff v. Mesta Machine Co. et al.,* 286 Pa. 199, 212, 133 A. 256); if it was the intention of the board to make a finding of fact it should have done so formally instead of by implication; and in the absence of distinct findings of fact on material points the record should have been remitted by the court below *(Poellot v. Baltimore & Ohio R. R. Co.,* 109 Pa. Superior Ct. 471, 475, 167 A. 497).

The same objection applies to that portion of the board's opinion wherein it is stated: "When the decedent was first hired by the defendant company he was hired as a door tender and was told by his foreman that he should not walk or ride the slope, but should walk in the manway. His employment changed to brakeman and we are of the opinion that the evidence

---

"4. Doctor Davenport, who examined the body of Garrahan, the decedent, found laceration between six and eight inches long and three inches in depth at the deepest point on the inner aspect of the right thigh running toward the groin with the severance of the femorrhal [femoral] artery. There were no other marks on the body and the face and hands and arms were in good condition.

"5. The duties of the decedent brakeman and the runner of the motor on which he worked obliged them to haul loaded cars from the places of the miners to the foot of the slope and to distribute empty cars to the said places of said miners.

"Both the brakeman and his motorman had finished their work in connection with the moving of the mine cars but it was still the duty of the brakeman to throw certain switches in order to cut off the current supplied to the trolley wire which furnished the current to run the motor, and the decedent brakeman had proceeded to perform this last mentioned duty when the motorman last saw him.

"The first switch to be thrown was located at or near a branch near the foot of the slope. The second switch or double switch was located at a point on and along the manway approximately 1500 feet distant from the first mentioned switch.

does not warrant a finding that after the decedent became a brakeman that he received a positive order from his employer not to walk or ride the slope; however, it appears that it was generally known by the employees of the defendant that walking or riding the slope was not permissible and that an employee would be penalized, if he were seen either walking or riding the slope." Parts of this paragraph conflict with the sixth finding of fact of the referee, which the board affirmed, although once again the board made no specific finding of fact based on its opinion of the evidence. When the matters to which we have already referred are considered together with the additional finding of fact made by the board, to which we hereafter refer, the difficulty of discovering the exact basis of the board's action becomes even more apparent.

The board points to evidence that there were two ways of reaching the first switch near the foot of the slope, and that under the circumstances deceased was

---

"The slope and the manway parallel each other and are separated by a distance of 70 feet from the center to the center. The manway lies on the left of the slope in the direction toward the top of the slope.

"The injured body of the decedent was found by the runner lying on the right hand side of the slope in the direction toward the top of the slope.

"6. Garrahan had been instructed by the Mine Foreman, the Section Foreman and the Fire-boss to use the manway in his traveling instead of the slope from which he was specifically prohibited from traveling by his said superiors who told him not to walk or ride on the slope, but to always use the manway.

"7. The point at which Garrahan's body was found lies between the two points where were located the switches which he was obliged to throw to cut off the current of electricity [by way of the slope].

"8. From the testimony and exhibit showing the slope and the point where Garrahan was found it might be inferred that he had been walking or riding the slope at the time of the accident but we believe that such inference would be altogether too conjectural under the circumstances to find as a fact."

justified in using the slope in order to reach the first switch. Then it states: "We find as a fact that the nature of decedent's employment required that he walk up the slope several hundred feet to turn off a switch and although he was not required to continue on up the slope to reach the other switches that he was required to turn off, but by so doing he was not violating a positive order of his employer; and that he was at a place on the operating premises of his employer, a place where the nature of his employment permitted him to be at the time he sustained his fatal accident and injury. (*Dickey v. P. & L. E. R. R. Co.,* 297 Pa. 172, 146 A. 543)." We do not see how this finding and the sixth finding of the referee and board can stand together. If the sixth finding is to stand, then deceased, under the board's own finding, was violating a positive order if he was traveling up the slope to the other switches. This contradiction cannot be resolved by applying the principle of *Dickey v. Pittsburgh & Lake Erie R. R. Co.,* 297 Pa. 172, at page 174, 146 A. 543, at page 544, where the Supreme Court said: "We said in *Shoffler v. Lehigh Valley Coal Co.,* 290 Pa. 480 [139 A. 192] : ' "Course of employment" does not include (a) injuries received while away from the actual place of employment, where the deviation or departure is wholly foreign to his duties and amounts to an abandonment of employment; (b) injuries received in the commission of an act which is in direct violation of the law; or (c) *an act contrary to the positive orders of the employer.'*

"While there are authorities which sustain the principle announced in clause (c) (see *Walcofski v. L. V. Coal Co.,* 278 Pa. 84 [122 A. 238] ; *Pokis v. Buck Run Coal Co.,* 286 Pa. 52 [132 A. 795] ; *Shoffler v. L. V. Coal Co.,* supra), it cannot be given the broad interpretation here suggested. It was not our intention to deny recovery under the Workmen's Compensation Act for all violations of positive orders, and the cause mentioned in clause (c) as taking the employee out of the

course of employment must be considered in connection with the facts in the cases to which it relates. Because of the scope it is here apparently made to cover, we give this phrase further explanation.

"Care must be taken not to confuse the principle enunciated, with negligent acts *(Gurski v. Susquehanna Coal Co.,* 262 Pa. 1 [104 A. 801]), wilful misconduct *(Waite v. Pittsburgh Limestone Co.,* 78 Pa. Superior Ct. 7), or those acts in disregard of positive orders of the employer where the employee's duties included the doing of the act that caused the injury, or where his duties were so connected with the act that caused the injury that, as to it, he was not in the position of a stranger or trespasser. The violation of positive orders under these circumstances does not prohibit compensation for injuries sustained therefrom.

"However, injuries resulting from those acts which are in direct hostility to and in defiance of positive orders of the employer concerning instrumentalities, places or things about or on which the employee has no duty to perform, and with which his employment does not connect him, are not compensable under the clause in question."

Assuming that deceased was warranted in violating the order of his employer by using the slope to reach the first switch, the evidence is undisputed that he was not required to use it in order to reach the other switches about 1500 feet farther up in the manway. It does not appear that he had any duty to perform at the place of the accident, or that he had any connection with the operation of the slope at the time, or that there was any reason to be at the place where he was found. The map of the workings, which is a part of the record, shows the point where it was agreed that deceased's body was found, and this point is more than 1200 feet beyond any point on the slope which the deceased might have used in order to reach the first switch. Consequently, it cannot be said that he "was

at a place on the operating premises of his employer
...... where the nature of his employment permitted
him to be."

The equivocal character of the board's opinion and
the evident conflict between its finding and, that of the
referee, which it affirmed, render this case one for the
application of section 427 of the Workmen's Compensation Act of June 2, 1915, P. L. 736, art. 4, as amended,
77 PS §877. See *Wyinskie v. Philadelphia & Reading
Coal & Iron Co.,* 95 Pa. Superior Ct. 170; *Allen v.
Bill's Tire Shop et al.,* 95 Pa. Superior Ct. 162; *Kocher
v. Kocher et al.,* 300 Pa. 206, 150 A. 468. As said in
*Todd et al. v. State Workmen's Ins. Fund et al.,* 295
Pa. 14, at page 17, 144 A. 819, at page 820: "In compensation cases, the evidence comes before the courts
for the purpose of ascertaining whether there is any
competent evidence on the record to sustain the findings
made by those vested with power to ascertain and state
the facts, not to enable the court to weigh the testimony
and make its own findings."

The findings of fact by the referee and the board
should be sufficiently definite to enable the reviewing
court properly to perform the duties imposed upon it
which are to determine questions of law, those questions being whether findings of fact by the referee or
board are supported by competent evidence and the
law has been properly applied. Where, as in the case
at bar, the compensation authorities have failed to so
find the facts, it is sometimes impossible for this court
to decide the issues before it. See *Poellot v. Baltimore
& Ohio R. R. Co.,* supra, page 474.

The judgment of the court below is reversed; the
record is remitted to the court below with instructions
to transmit it to the board for further action not inconsistent with this opinion.