Milton **MAZER**, Administrator of the Estate of Israel Abrams, deceased

v.

**Hattie LIPSHUTZ, Executrix of the Estate of Benjamin Lipshutz, deceased.**

Milton **MAZER**, Administrator of the Estate of Israel Abrams, deceased

v.

**Dr. Peter CHODOFF, Defendant and Third-Party Plaintiff,**

v.

**Hattie LIPSHUTZ, Executrix of the Estate of Benjamin Lipshutz, deceased**

and

**The Albert Einstein Medical Center, Southern Division, Third-Party Defendants.**

Civ. A. Nos. 25749, 27438.

United States District Court
E. D. Pennsylvania.

Sept. 20, 1962.

Harvey B. Levin, Bernstein & Bernstein, Philadelphia, Pa., for plaintiff.

John B. Martin, Duane, Morris & Heckscher, Philadelphia, Pa., for defendant and third party defendant Benjamin Lipshutz.

Francis E. Shields, Pepper Hamilton & Sheetz, Philadelphia, Pa., and Philip Dorfman, Dorfman, Pechner, Sacks & Dorfman, Philadelphia, Pa., for defendant and third party plaintiff Dr. Peter Chodoff.

JOSEPH S. LORD, III, District Judge.

Plaintiff's decedent, Israel Abrams, died on January 4, 1958, following an operation on December 19, 1957. On December 17, 1957, Abrams had entered the Albert Einstein Medical Center, Southern Division (Hospital), for elective gall bladder surgery and common duct exploration. He was placed in Room 807. On the very same day, another Israel Abrams entered the same hospital and was assigned to Room 342. Following usual hospital practice, the anaesthetist, Dr. Peter Chodoff, ordered that two pints of whole blood be made available in the operating room. This blood was, in fact, supplied from the hospital blood bank and was in a small refrigerator in the operating suite before the operation began.

During the course of the operation, a massive hemorrhage occurred in the patient's abdomen and Dr. Chodoff sent for a bottle of blood. When it arrived in the operating room, Dr. Chodoff noted that it was labeled "Israel Abrams", but that it bore an incorrect room number. He sent for the head blood bank technician, Albert Kohn, who came to the operating room and spoke to Dr. Chodoff. Kohn did not enter the operating room proper. He remained in the operating suite about 5 feet away from Dr. Chodoff and spoke to him through an open door. There was evidence to justify a finding that Kohn knew then that there were two Israel Abramses in the Hospital. Kohn nevertheless assured Chodoff that the blood was the correct blood for the Israel Abrams then on the table. Thereafter, a total of six pints of blood was administered to Abrams.

Shortly after the blood had been administered, Abrams suffered a transfusion reaction and after certain checks had been made it was determined that Abrams had received six pints of incompatible blood. Specifically, Abrams was type "O" RH Positive and he had been given type "A" RH Positive. There was evidence that the administration of the wrong type of blood was a substantial factor in causing his death.

It also appeared that Dr. Lipshutz closed the decedent's abdomen leaving two sponges in the operative site. When a sponge count was taken and the sponges found to be missing, the wound was reopened and one sponge removed. There was evidence indicating that the critical condition of the patient prevented the removal of the other sponge at that time. On December 23, 1957, Abrams was transferred to the University of Pennsylvania Hospital where an artificial kidney was used in an attempt to save his life. Dr. Lipshutz at no time told the doctors at that hospital of the presence of the remaining sponge. There was evidence that the abandoned and unreported sponge set up an infection which contributed to Abrams' death, but there was also evidence that the sole cause of death was the incompatible blood.

Two suits were brought: the first was against Dr. Benjamin Lipshutz, the surgeon who actually performed the opera-

tion (C. A. No. 25749); the second was against Dr. Chodoff, the anaesthetist, whose admitted duty it was to administer the blood in a transfusion (C. A. No. 27438). Chodoff, in his suit, joined the Hospital as a third party defendant. Lipshutz having died before the trial, his executrix was substituted and the two cases were consolidated for trial.

Three interrogatories on fault were answered by the jury:

"1. Was there negligence on the part of Dr. Chodoff which was a contributing cause of the death of Israel Abrams?

ANSWER: No."

"2. Was there individual negligence on the part of Dr. Benjamin Lipshutz which was a contributing cause of the death of Israel Abrams?

ANSWER: No."

"3. Was there negligence on the part of any employee of Albert Einstein Medical Center, Southern Division, other than Dr. Chodoff which was a contributing cause of the death of Israel Abrams?

ANSWER: Yes."

Since the plaintiff had previously executed a joint tort-feasor release in favor of the Hospital, and in light of the exculpatory answers of the jury as to the individual defendants, the findings, with the consent of the parties, were molded into a verdict for the two individual defendants. Plaintiff has filed three motions: in the suit against Lipshutz (C. A. No. 25749) a motion to alter the judgment or, in the alternative, a motion for a new trial; in the Chodoff case, a motion for a new trial.

## I

### MOTION TO ALTER JUDGMENT

In this motion, plaintiff asks us to set aside the judgment entered in favor of Dr. Lipshutz's executrix and to enter judgment for plaintiff. The motion is based on the jury's finding that the negligence of an employe or employes of the Hospital, other than Dr. Chodoff, was a substantial factor in producing the death. From this, plaintiff argues that (1) that finding necessarily includes Kohn as the negligent actor; (2) Kohn's negligence occurred in the operating area; (3) Lipshutz was liable as a matter of law on a *respondeat superior* basis for the negligence of the Hospital personnel in the operating area.

Plaintiff is met at the outset with an insuperable obstacle. The jury's finding gives us no warrant for the assumption that Kohn was the Hospital employe found negligent. Kohn testified:

"Q Can you tell us how Israel Abrams, in Room 807, got the wrong type of blood?

"A My only explanation is that I received a specimen of blood, I cross-matched it; it was labeled as blood for Israel Abrams in Room 807; he received it. The original specimen was wrong."

"Q The blood that was delivered to you with the form on with Israel Abram's name and Israel Abram's room number was not his blood?

"A That is right; that is the only explanation I can make."

If the jury accepted this testimony, as it certainly could, it could well have found that some unidentified employe was negligent in taking a specimen from the wrong person, or in mislabeling the specimen, or in confusing the specimens in transit. Furthermore, if the jury believed Kohn it could well have concluded that Kohn was justified in assuring Dr. Chodoff that the blood was correct and, hence, that Kohn was not negligent.

■■ If the jury's finding on Interrogatory No. 3 inculpated an employe other than Kohn, as well it might, Lipshutz cannot be held liable on this record. The employe or employes involved are by hypothesis in the general employ of the Hospital. Dr. Lipshutz would be answerable for their negligence only if he

made them his servants and the determination of this, of course, depends on the evidence. In Yorston v. Pennell, 397 Pa. 28, at page 39, 153 A.2d 255, at page 259 (1959), the court said:

" * * * in determining whether a person is the servant of another it is necessary that he not only be subject to the latter's control or right of control with regard to the work to be done and the manner of performing it but that this work is to be performed on the business of the master or for his benefit. * * "

This record is totally barren of evidence that Dr. Lipshutz had the slightest degree of control or right of control over Hospital personnel generally. Hence, lacking such evidence and since the jury's answer did not identify either the employe or the nature of the negligence, plaintiff's motion must be denied.

## II

### THE MOTIONS FOR NEW TRIAL

There were, of course, two separate cases here, consolidated for trial, and plaintiff has filed two motions for new trial,—one in Dr. Chodoff's case, and the other in Dr. Lipshutz's case. However, Reasons 4 and 5 in the Lipshutz case are identical with Reasons 2 and 3 in the Chodoff case and these can conveniently be discussed together. They read:

"There was fundamental error in the court's charge to the effect that there were three defendants in the case and that the hospital, although not represented by counsel, was nevertheless a party defendant, since there was no direct action by the plaintiff against the hospital and a finding of negligence on the part of the hospital was material only if the jury found negligence on the part of either or both of the original defendants."

"The Special Interrogatories were fundamentally erroneous and misleading in that the jury was instructed to answer the damage questions (#4 and #5) if the answer to any of the first three questions was 'Yes', whereas question #3, #4 and #5 [1] should have been answered only if the answer to question #1, or #2, or both, was 'Yes' ".

The basic complaint of the plaintiff seems to be that the jury was misled as to the effect of its verdict, and that had the jury been led to suspect the actual effect, it would have reached a different result. But it is not the province of a jury to shape factual findings to meet a desired result; rather, it is the jury's duty to find the facts from the evidence no matter what the result. In effect, plaintiff speculates that this verdict was emotional because the jury wanted not to encumber either individual defendant with the stigma of malpractice, but was satisfied to place that onus on the selfless Hospital. However, plaintiff wants only this emotionalism reversed, i. e., if the jury had known that the fruits of its verdict would never reach the widow and children of decedent, it would have found the facts differently.

We think that here, fact finding based upon desired outcome was eliminated as much as it could possibly be. One of the very purposes of interrogatories such as were submitted here is to remove from the jury's consideration any question as to which side the factual finding will favor. In Ruddy v. New York Central Railroad Company, 124 F. Supp. 470, at page 472 (N.D.N.Y., 1954), the court said:

" * * * However, the design of the special verdict procedure is to obtain answers to questions of fact with the knowledge of the jury lim-

---

1. Interrogatory #4 related to damages under the Survival Act; Interrogatory #5 related to damages under the Wrongful Death Act.

ited as to whether its findings will favor one side or the other. * * "

See also Skidmore v. Baltimore & O. R. Co., 167 F.2d 54, 66 (C.A.2, 1948).

■ Here, the jury was directed to answer three simple liability questions which required an appraisal of the facts. We must assume that the jury followed the court's instructions and found the facts from the evidence and not from the characterization of the parties.

■■ We can see no error either in the charge or in the way the interrogatories were submitted, and neither, apparently, could plaintiff until after the adverse results of the trial. Plaintiff, although given full opportunity to do so, submitted no request to charge that plaintiff had no claim against the Hospital, and took no exception to the charge as given. There was no request to modify the sequence in which the interrogatories should be answered. While we are convinced that there was no prejudicial error either in the charge or in the submission of the interrogatories, the failure to raise timely objection is in any event a fatal omission under Fed. R.Civ.P. rule 51, 28 U.S.C.A.: Borkovic v. Pennsylvania Railroad Company, 180 F.Supp. 495 (W.D.Pa., 1960); Halprin v. Mora, 231 F.2d 197, 200 (C.A.3, 1956).

In Borkovic, supra, the court said, at page 500 of 180 F.Supp.:

"* * * In fact, this seems to be the very type of case for which Rule 51 was designed, for if counsel's present objections had been called to the Court's attention at the time of trial, any possible error or ambiguity in the charge as given could have been readily corrected or clarified by the Court. * * *"

■ Plaintiff asks us to set aside the findings in favor of the two doctors on the ground that they are against the weight of the evidence. We say quite frankly that had this court been the finder of the facts, the results would have been different. But this, under our system, is not the test: Neff v. Pennsylvania R. Co., 7 F.R.D. 532 (E.D.Pa., 1948); Elliott v. United States Steel Corporation, 194 F.Supp. 936 (W.D.Pa., 1961). The jury system does not produce absolute justice. (One may ask parenthetically what is, or if there is, "absolute" justice?) But the jury system comes as close to it as finite minds can. The jury represents a distillate of the community. It reflects the composite thinking of twelve individuals, welded into a homogeneous one which leavens all of the interplay and nuances of thinking, of philosophy, of apperceptive background, of heredity and environment, of economic stresses, of religion, of politics, of prejudices (or lack of them),—in short, of all the forces that make a sentient and at the same time emotional human being. It is the essence of humanity that all of these forces are present in every adult human. When a trial judge expounds the law, he is supreme (until reversed). But when he views the facts, he is no more than another human member of the community whose factual judgment is no better and no worse than any other member of the same community. Indeed, the conscientious trial judge tells the jury: "Do not surrender a firm principle, but do not close your ears to the views of your fellows." And yet, these are views the trial judge never hears. Casting the judge out of his robe in factual matters, as every judge insists to the jury he must be, he becomes less than one of them. He is not a synthesis of twelve, as they are, but only one whose factual views may have crystalized without the catalytic benefit of factual discussion.

■ It is for these reasons that courts are understandably loathe to disturb jury verdicts where there is evidence to support them: cf. Lind v. Schenley Industries, Inc., 278 F.2d 79, 91 (C.A.3, 1960). When a jury has found facts, that finding should not be dis-

turbed unless there has been (1) legally prejudicial error properly excepted to, or (2) a result so palpably unsupportable that only bias, prejudice, passion or sympathy could have produced it. Finding neither here, these grounds of plaintiff's motions are denied.

Plaintiff's 6th Reason for a new trial as to Dr. Lipshutz is:

"The Court erred in refusing plaintiff's Additional Point for Charge #10 as follows: 'I charge you that if the incompatible blood administered to Israel Abrams resulted from any negligent act or acts committed by an employee or employees of the Albert Einstein Medical Center, Southern Division, that Dr. Lipshutz and therefore his Estate would be responsible by reason thereof.' "

What we have said in disposing of the Motion to Alter Judgment disposes also of this contention. Dr. Lipshutz would be liable for the Hospital employes' negligence only under the *respondeat superior* criteria of the right to control the work to be done, the manner of its performance, and whose work was being done. The point as drawn includes none of those essentials and it was properly refused.

As to Dr. Lipshutz, plaintiff also urges that he "failed to meet the burden of proof that Dr. Lipshutz was not negligent with respect to the sponges left in decedent's abdomen." It is unnecessary to pass on this contention, however. The jury was, of course, charged on causation and Interrogatory No. 1 necessarily included causation as an essential element. There was a sharp conflict as to whether the sponge was a causative factor in producing the death. The jury could have accepted the evidence that it was not in reaching its answer to the Interrogatory. And again, there was no request to charge on this point at the trial pursuant to the demands of F.R. Civ.P. 51.

Plaintiff complains of the remark by Dr. Chodoff's counsel in his summation that an adverse verdict "would be a millstone for the rest of his life". The comment was certainly improper, but no motion was made at the time or later either for the withdrawal of a juror or for a cautionary instruction. In Faudree v. Iron City Sand & Gravel Company, 201 F.Supp. 447, at page 450 (W.D.Pa., 1962), the court said: " * * * Though a trial judge is an administrator primarily charged with the just conduct of the trial, he may not ordinarily be put in error merely because an aberration from trial rules has occurred. It is the duty of counsel, by objection, to call such threatened or actual departure to the judge's attention and invoke his corrective action and, if overruled, to make it appear that prejudice has resulted. * * * " A party may not sit silent for reasons of his own, in the face of improper comment, take his chances on the verdict, and then ascribe the comment as the basis for a new trial: Picard v. Pittsburgh & Ohio Valley Railway Company, 153 F.Supp. 583, 588 (W.D.Pa., 1957).

Finally, plaintiff says, as to Dr. Chodoff:

"Upon the uncontradicted evidence that Dr. Chodoff had the right to direct and control Mr. Kohn with respect to re-checking the blood when the erroneous room number on the first bottle of blood was discovered in the operating room, the court should have charged the jury that Dr. Chodoff was legally responsible for any negligence of Mr. Kohn in these circumstances."

During the arguments on defendants' motions for a directed verdict and again after all the evidence was in, plaintiff's counsel expressly conceded that Dr. Chodoff was not responsible for any negligence of blood bank personnel, including Mr. Kohn. Of course, in light of counsel's then view of the evidence and the law, there was no request to charge and

no exception to the failure to charge to this effect. We think counsel was right then, and wrong now. But in any event, plaintiff's affirmative acquiescence with the charge as given compels us to negate this reason as any ground for a new trial.

The motions for a new trial are denied.