**Denise MAUK and Paul R. Finkler, Plaintiffs,**

**v.**

**Stephen T. WRIGHT et al., Defendants.**

**Civ. No. 71–362.**

United States District Court,
M. D. Pennsylvania. ·

Dec. 7, 1973.

---

---

Edward S. Finkelstein, Harrisburg, Pa., for plaintiffs.

Richard H. Wix, Wix & Wenger, Harrisburg, Pa., for defendants.

## MEMORANDUM AND ORDER

HERMAN, District Judge.

### INTRODUCTION:

The instant case arises out of an automobile accident in which the plaintiff Denise Mauk was injured.[1] Miss Mauk was the sole occupant of a 1969 Volkswagen owned by the plaintiff Paul L. Finkler. The defendant Stephen T. Wright was the driver of the other vehicle, a 1968 Lincoln Continental, owned by defendant Roy L. Schmidt. Both Wright and Schmidt were employed as professional football players for the defendant Pro Football, Inc. (hereinafter the Washington Redskins). The Redskins and Schmidt have separately moved for summary judgment.

The auto accident at issue occurred shortly after Midnight on July 31, 1971 under apparently rainy conditions (deposition of Wright, p. 35). The defendant Wright had just picked up a girl friend to give her a ride from her place of employment to her residence in Carlisle, Pennsylvania. Carlisle is the site of the Redskins' "Annual Training Camp," located on the campus of Dickinson College. The training camp was operated from approximately July 10 until about Labor Day of 1971 (deposition of Redskins' Coach George Allen, p. 4). The nature of the camp will be examined in some detail *infra* as it is crucial to the plaintiffs' case.

The day before the accident had apparently been spent by the players in ordinary football training exercises. Following the dinner hour the team viewed training films until mid-evening when it was suggested they watch the annual College All-Star football game which began at 9:00 P.M. on the evening of July 30. Coach Allen described the televised game as a "clinic for us. We like to see it. It helps us to evaluate other players" (Allen deposition, p. 7).[2]

The players all operate under a curfew which that evening was set at thirty minutes following the end of the televised game. The usual curfew, accompanied by a bed check, was 11:00 P.M., with lights out fifteen minutes later (Allen deposition, p. 7).

Wright watched the game for a time at a local "beer joint" then proceeded to a local cocktail lounge where his girl friend was employed. There he encountered several other team members (Wright deposition, p. 33). Several

---

1. Jurisdiction is based on 28 U.S.C. § 1332, the plaintiffs being residents of Pennsylvania; the defendant Pro Football, Inc. is a Maryland Corporation. Defendant Wright is a resident of Virginia, and defendant Schmidt resides in Georgia. The prayer for damages exceeds $10,000, exclusive of interest and costs.

2. At page 8 of Allen's deposition he indicates the players were free to do anything during the time of the All-Star game. Wright's deposition does not make clear whether he understood the television viewing to be optional (deposition, p. 29).

**964**

minutes later, at about Midnight, Wright and his girl friend left the cocktail lounge and were shortly thereafter involved in the collision. Because of the curfew, Wright would have had to proceed directly from the lounge to drop off his girl friend and thereafter to the dormitory on campus.

Miss Mauk seeks compensation for permanent injuries, medical expenses, loss of earnings and pain and suffering, naming all three defendants. Finkler is claiming compensation from all three defendants for the destruction of his automobile.

## PRO FOOTBALL'S MOTION FOR SUMMARY JUDGMENT:

The novel and complex problem now before the court arises from the motion for summary judgment by the defendant Washington Redskins. In a motion for summary judgment, pursuant to Rule 56, Federal Rules of Civil Procedure, the movant has the "burden of showing the absence of any genuine issue of fact." Adickes v. Kress & Co., 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970). The Third Circuit has concluded that "matters presented must be construed most favorably to the party opposing the motion, and that it is well settled that such a motion will not lie where there is a genuine issue as to a material fact." Long v. Parker, 390 F. 2d 816, 821 (3d Cir. 1968).

The court must not only construe the facts favorably to the plaintiffs, but as noted in Kridler v. Ford Motor Co., 422 F.2d 1182, 1184 (3d Cir. 1970):

> "[A] case must be submitted to the jury if 'the evidence presented [is] such that . . . a jury can reach the conclusion sought by plaintiff, and not that that conclusion must be the *only* one which logically can be reached. . . . [I]t is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability . . . .'" Quoting Smith v. Bell Telephone, 397 Pa. 134, 138, 153 A.2d 477 (1959) (Emphasis in original)

We must therefore view our task as determining whether the movants have met their burden of establishing that as a matter of law no reasonable construction of the facts would support a jury finding that Pro Football, Inc. could be liable under the doctrine of *respondeat superior* based upon a master-servant relationship.

The essence of the plaintiffs' argument is that professional football players, in the context of training camp, are effectively under twenty-four hour per day control, seven days per week. As a result, the plaintiffs contend even leisure time is spent within the scope of the employment relationship.

The Redskins' professional training camp lasts approximately seven weeks during the summer, immediately preceding the onset of exhibition games and the regular competitive season. The training session serves two basic purposes: to physically prepare the players for the grueling schedule of games and to allow the coaching staff to observe players to determine which men will be "cut" from the roster. The National Football League limits a team to 40 members.

During the training period the team members remain on the college campus, living and eating there seven days a week, in order to "prepare and discipline" (deposition of Coach Allen, p. 6). Briefly, the control over the players consists of requiring all players to live in the college dorms away from their families. They must take all meals in the college cafeteria and in fact are fined if they fail to attend a meal. They, of course, have daytime training sessions which are mandatory, as are evening sessions viewing training films with particular coaches, etc. (A $200 fine was levied on a player who was late to an evening meeting. Allen deposition, p. 25).

The team also requires that players be in their rooms with lights out by a certain hour. Coaches conduct bed checks to assure compliance. The players were required to meet certain weight require-

ments or be fined. (One player was fined $2,000 for being overweight. Allen deposition, p. 25).

The players are not permitted to date students at the college. They are not permitted to ride motorcycles. The player contract carried further provisos that prohibit drinking intoxicants; prohibit association with gamblers; require reporting any injury to the coach and club physician; require the wearing of coats and neckties in all public places; and prohibit television appearances and interviews without the Club's consent.

The entire National Football League provides a unique backdrop to the employment situation. The standard player contract [3] has clauses which if violated effectively bar the player from joining any other team.[4] As a general provision of employment, the Redskins' rules for training camp provide: "The Club reserves the right to impose and require observance of reasonable standards of personal conduct, regardless of whether these situations are directly connected with the team.[5]

This brief outline of the professional training camp reveals, according to the plaintiffs, an employment situation so unique that recreation time is an integral part of employment.[6]

This court is bound by the law of the courts of Pennsylvania. Wilson v. United States, 315 F.Supp. 1197 (E.D.Pa.1970) [7] The Pennsylvania courts have concluded that the jury must be the fact finder as to the issue of employment. Testard v. Penn-Jersey Auto Stores, Inc., 154 F.Supp. 160, 162 (E.D. Pa.1956). *See also,* Baker v. Texas & P. R. Co., 359 U.S. 227, 229, 79 S.Ct. 664, 3 L.Ed.2d 756 (1959); McGuire v. United States, 349 F.2d 644, 646 (9th Cir. 1965). The scope of employment is also in the province of the jury. Norton v. Rwy. Express Agency, Inc., 412 F.2d 112, 114 (3d Cir. 1969). In Norton the court concluded:

> "There is no question that under the law of Pennsylvania, the scope of the authority or employment of an agent or servant is a factual issue for jury determination. . . . " [8]

---

3. *See,* Comment, "Contractural Rights and Duties of The Professional Athlete—Playing the Game in a Bidding War," 77 Dick.L.Rev. 352 (Winter 1973).

4. Section 8.13(a) of the NFL Constitution and By-Laws permits the NFL Commissioner to cancel a player's contract league-wide if he engages in "conduct detrimental to the welfare of the league or professional football."

5. The plaintiffs urge upon the court the case of Rentzel v. Rozelle, No. C63828 (Calif. Sup.Ct., Los Angeles County, August 23, 1973), in which that court enforced the NFL Commissioner's power to suspend a player indefinitely for off-field activity not directly related to football. (The Commissioner based his ruling on the provision in the preceding note) The California court concluded:

> "It is clear that the defendants have sought for years to establish a standard of public conduct for professional football participants, including players. This standard (which might be better termed 'image') includes the portrayal of players as high type, admirable young men who are worthy of the respect and emulation of the young. . . . This is under-

standable, for professional football is a privately owned and operated entertainment enterprise pursued by those in it for their own gain, and they have determined that it is in their best interest to promote an image (that is, maintain a standard of public conduct) of a kind described above."

6. It is important to note that the movant did not alternatively argue deviation from scope of employment, disobeying an employer's directive or temporary abandonment. Instead, the defendant based its motion entirely upon the supposition that no possible construction of the "free time" could bring it within the definition of scope of employment.

7. Unless otherwise excepted, federal cases arising out of Pennsylvania are cited for their construction and adherence to Pennsylvania state court rulings.

8. The Pennsylvania courts and the Restatement (Second) of Agency draw distinctions between agency and master-servant relationships. *See,* P.L.E. Agency § 2; Restatement (Second) of Agency § 2. However, the distinction is not significant to the limited areas of burden of proof, jury roles, and summary judgment.

■■ The Supreme Court of Pennsylvania has described the jury's fact finding role in such cases as "well settled." Anzenberger v. Nickols, 413 Pa. 543, 546, 198 A.2d 309 (1964). Moreover, the test of whether the factual issue should reach the jury turns on whether "any reasonable inference from the facts supports the finding that the employee was acting in furtherance of the . . . [employer's] business." Pillo v. Jim Banes Ford, Inc., 410 Pa. 417, 418–419, 189 A.2d 850, 851 (1963).

There existing no fixed rule for determining the existence of a master-servant relationship, Bonney Motor Express, Inc. v. United States, 206 F.Supp. 22, 26 (E.D.Va.1962), the court must therefore act on a case by case basis. R & H Corp. v. United States, 255 F.Supp. 870 (W.D.Pa.1966).

■ An understanding of the controlling law is necessary. First, there must exist a master-servant relationship between Wright and the Redskins. Second, Wright's activities surrounding the accident must have been within the scope and course of that employment relationship in order to make the Redskins liable. Dickerson v. American Sugar Ref. Co., Inc., 211 F.2d 200 (3d Cir. 1954); United States v. Lushbough, 200 F.2d 717, 720 (8th Cir. 1952); Kemerer v. United States, 330 F.Supp. 731 (W.D. Pa.1971); Lunn v. Yellow Cab Co., 403 Pa. 231, 235, 169 A.2d 103 (1961). Further, the federal courts do not apply *respondeat superior* unless and until a master-servant relationship is established.

■ Once a master-servant relationship is established, there must exist a scope and course of employment sufficiently broad to encompass the servant's allegedly negligent conduct. As noted, the existence of a master-servant relationship is a factual issue for the jury. The subsequent inquiry into the scope of employment is likewise a jury question. Further, *respondeat superior* depends upon a showing of benefit to the employer arising from the servant's activity during the scope of employment. Dual motivation, however, does not negate scope of employment. Restatement (Second) of Agency § 236. The question of benefit to the master is also in the province of the jury.

We, therefore, must examine these interrelated legal questions to determine if any reasonable construction of the facts presented by the plaintiff could support a jury's finding that:

(1) There existed a master-servant relationship between Wright and the Washington Redskins;

(2) The accident complained of occurred during the course and in the scope of Wright's employment;

(3) Wright's activities at the time of the accident rendered benefit to the employer;

(4) Wright's conduct was negligent and the proximate cause of the complained of injuries.

The last finding (also for the jury) is not at issue for the purposes of this motion for summary judgment.

■ Master-Servant in Pennsylvania [9] —We begin with the basic definitions of "master" and "servant":

" 'A master is one who stands to another in such a relation that he not only controls the results of the work of that other, but also may direct the manner in which such work shall be done. A servant is one who is employed to render personal services to his employer otherwise than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the latter. The relation of master and servant exists where the employer has

---

9. A substantial number of the master-servant scope of employment cases are based on workmen's compensation. However, such decisions are good authority in the present context. *See*, Kadlecik v. Renault & Sons, Inc., 156 Pa.Super. 586, 591, 40 A.2d 866 (1944).

the right to select the employe, the power to remove and discharge him, and the right to direct both, what work shall be done, and the way and manner in which it shall be done.'

" 'It is essential to the relation of employer and employee . . . that the employer shall have the power and authority to direct and control the acts of the alleged employee.' " Matonti v. Research-Cottrell, Inc., 202 F. Supp. 527, 532 (E.D.Pa.1962).

■ Pennsylvania law essentially requires satisfying four basic elements to find a master-servant relationship: (1) the right of employer to select employee, (2) the right and power to remove the employee, (3) the power to direct what the employee will do and the manner of performance, (4) and the potential power to control the employee. Matonti, *supra*; 53 Am.Jur.2d Master and Servant § 2 (see n.11 *infra*).

The right to select and remove an employee are uncomplicated powers clearly required and clearly present here. Matonti, *supra*. An examination of the depositions and the standard player contract reveal that the Redskins had the authority to "cut" or trade any player for virtually any reason.

The control exercised by an employer is either actual or potential. Yorston v. Pennell, 397 Pa. 28, 39, 153 A.2d 255 (1959). As the court there noted:

"Actual control, of course, is not essential. It is the right to control which is determinative." *See also,*

Mazer v. Lipshutz, 31 F.R.D. 123 (E. D.Pa., aff'd, 327 F.2d 42 (3d Cir. 1964).

■ Correlative to control is the right to dictate the way in which a task shall be performed. Ragano v. Socony Vacuum Oil Co., 376 Pa. 271, 274, 101 A.2d 686 (1954).

An additional form of control is that over the employee as an individual during the tenure of employment. That is, complete authority to order the servant about during the working day, even though the employee may be physically absent. Dickerson v. American Sugar Refining Co. Inc., *supra*; Ragano, *supra*; Yorsten, *supra*.

The limited portion of each day given over to the players during training camp was sufficiently restricted by regulations to satisfy what the Ragano court described as the "right or authority to interfere or control," 376 Pa., at 274, 101 A.2d at 687. A factual dispute exists in the instant case on the point of control during "free time." Allen asserts that he has no rules regarding free time (deposition, p. 8). Yet Wright, the contract, and Redskin rules seem to be contra.[10] This is a conflict of fact the court is not prepared at this time to resolve.

It appears that the Redskins coaching staff had a 24-hour per day potential control over the team members which was contractually enforcible if the staff chose to exercise it. The coach could and often did enforce restrictions on vir-

10. The Wright deposition reveals the player awareness of restrictions:

"Q. Okay, were there activities that you were not supposed to become involved in or do during the free time that you had, in light of the teams rules and regulations and the league's rules and regulations?

"A. Yes.

"Q. And were you consciously aware of these rules and regulations while you were conducting yourself in this free time?

"A. Yes.

"Q. And did they, in fact, have a limitation on your activities during that free time?

"Yes.

"Q. You seem to indicate that strongly. Is that your feeling?

"A. Indubitably.

"Q. Could you explain a little now, please.

"A. Yes, I think—well, again, the time limit. I think when I say it emphatically, as you stated, you have to understand that at training camp is probably the most miserable thing in the world to go through and we have only so much time to just sit down and relax and we are governed by rules and regulations even though we are sitting down and relaxing . . . ." Wright deposition, pp. 25–26. (*See also*, deposition of Roy Schmidt, pp. 16–17)

tually every form of off-field activity. The instant employment relationship included the potential to restrict the actions of the players at all times, aptly meeting the descriptive term "interference" noted in Ragano, *supra*. This does not answer the query as to whether the recreation time falls within the scope of employment, but merely that the employer had the authority to control the "free time" on a daily basis.[11]

Given the present rendition of the facts, this court cannot say as a matter of law that a jury could not reasonably find a master-servant relationship between Wright and the Redskins.

■ Assuming *arguendo* the existence of a master-servant relationship, there must also exist evidence that Wright was acting within the course and scope of his employment in order for the crucial *respondeat superior* doctrine to apply. Kemerer v. United States, 330 F.Supp. 731 (W.D.Pa.1971). Course of employment requires the action to have been committed within the time and space of the employment. Vadyak v. Lehigh & New England R. R., 318 Pa. 580, 179 A. 435 (1935). Scope of employment provides the added requirement that the servant's activity must in some way further the employer's business: *id*. at 582, 179 A. 435; Lunn v. Yellow Cab Co., 403 Pa. 231, 169 A.2d 103 (1961). Moreover, the issue of scope of employment is one for the jury. Frankel v. Moody, 393 F.2d 279, 280 (3d Cir. 1968).

■ Course of employment permits minor deviations from assigned tasks so long as they do not constitute abandonment or are wholly foreign to the employment.[12] Combs v. Cole Bros. Circus, Inc., 165 Pa.Super. 346, 67 A.2d 791 (1949). In the negative sense, course of employment does not include commission of unlawful acts or acts contrary to positive orders of the employer. Kozak v. Joseph Reilly Coal Co., 141 Pa.Super. 413, 15 A.2d 531 (1940); Garrahan v. Glen Alden Coal Co., 135 Pa.Super. 307, 5 A.2d 437 (1939); Restatement (Second) of Agency § 229.

In Knowles v. Parker Wylie Carpet Co., Inc., 129 Pa.Super. 257, 261–262, 195 A. 445 (1937), the court wrote:

"[C]onsideration must be given to what he was doing at the time of the accident—whether actually engaged in the furtherance of his employer's interests—and all the attending circumstances. The injury must have some connection or be concerned in some manner with the business of the employer, and not be the result of engaging in private affairs disconnected therewith. . . ."

Illustrative of the Pennsylvania view are two cases. The first, French v. Coff Decorators, 199 Pa.Super. 482, 185 A.2d 646 (1962), involved a delivery man who was told on Friday that he would have to make certain deliveries the following day. The truck was loaded on Friday and the employee permitted to drive the truck home to avoid returning on Saturday. The employee drove to a restaurant for dinner. While there he was met by friends. The employee and friends left the restaurant together in the truck at 10:00 P.M. to visit an auto showroom several miles away. During the return trip the driver lost control and caused an accident. The court concluded that the facts were sufficient for a finding that the employee was acting within the course of employment, notwithstanding the time and the activity deviation.

The second case, White v. Morris, 182 Pa.Super. 454, 127 A.2d 748 (1956), supports the proposition that a deviation of time is not crucial. The court found an employee to be within the course of em-

---

11. The master-servant relationship has been defined as requiring at least a partial benefit to the business interest of the employer. Martin v. Wood, 400 F.2d 310 (3d Cir. 1968); Cmwlth. to the Use of Orris v. Roberts, 392 Pa. 572, 141 A.2d 393 (1958). However, the inquiry into the course and scope of employment also raises the same issue and it will be discussed *infra* in the discussion of *respondeat superior*.

12. See n. 6, *supra*.

ployment where he was instructed to drive his truck immediately to its destination, but detoured to his home. There he changed his clothes and rested for several hours. Once back on the highway the driver was involved in an accident.

As a measure of the breadth of scope of employment, the plaintiffs cite Frankel v. Moody, 393 F.2d 279 (3d Cir. 1968). In Frankel the court held the City of Philadelphia liable for the actions of a policeman who accidentally killed a friend in a "quick draw" contest. The victim, a store owner, had been a source of information and tips over a period of years. The court reasoned that the "quick draw" contest was within the scope of the policeman's employment because he and the victim had frequently engaged in such conduct. The contests, however misguided, had allegedly helped develop the friendship to the extent that the victim became a source of tips. The unreported district court opinion described the officer as "on duty and in uniform." (Civil No. 377–46, December 22, 1966).

There exists no Pennsylvania case even remotely on point as to whether off-duty recreation time falls within the course of employment. In Shoffler v. Lehigh Valley Coal Co., 290 Pa. 480, 139 A. 192 (1937), the Supreme Court concluded that recreation during hours of employment is within the course of employment. However, the court flatly said course of employment does not include "every hour of the day," nor injuries occurring off the employer's premises. Later decisions such as French and White, *supra*, make clear that time and location are not controlling. It seems, therefore, that Shoffler remains primarily as precedent that recreation time is not per se abandonment of employment. *See,* Henry v. Lit Bros., Inc., 193 Pa.Super. 543 (1960).

An additional factor which militates against summary judgment is the payment of Wright's medical expenses by the Redskins. Following the accident Wright was taken to the Carlisle Hospital where he was treated and released. The Redskins were billed approximately $100 for hospital and medical care, and subsequently paid the bill in full. Paragraph 14 of the contract between Wright and the Redskins reads:

"In the event that Player [Wright] is injured in the performance of his services under this contract . . . . the Club [the Redskins] will: (1) provide, during the term of this contract, such medical or hospital care as, in the opinion of the Club Physician, may be necessary . . . ."

Similarly, in Kemerer v. United States, *supra,* the government provided contractual death benefits to an employee's family. Later the government defended itself in a suit arising out of the decedent's negligence:

"[T]he federal agencies concluded that the estate and family of Gilg were entitled to benefits because Gilg was acting within the scope of employment when the accident occurred. It is not only inconsistent but illogical for the government to assert that Gilg was within the scope of his employment for purposes of compensation benefits yet to deny the same to avoid liability . . . ." 330 F.Supp., at 734.

The plain language of the contract and material now before the court, taken as a whole, reveals that the Redskins were contractually compelled to pay medical expenses only for injuries suffered "in the performance of his services . . . . " It seems, therefore, that a jury could reasonably find the payment supportive of plaintiffs' assertion regarding scope of employment. The payment is not dispositive of the issue, but it is relevant to reveal the Redskins own assessment of the situation.

According to Coach Allen (deposition, p. 8), the players average two free hours per day between the end of the evening meetings and curfew. The issue is whether that recreation time, in the context of training camp, comes within the course and scope of employment. The

**970**

plaintiffs rely heavily on two cases. Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943), and Murphey v. United States, 179 F.2d 743 (9th Cir. 1950).

Aguilar involved two incidents of seamen, themselves injured going to and from their ships while officially on shore leave. The Aguilar decision affirmed the case of Jones v. Waterman S. S. Corp., 130 F.2d 797 (3d Cir. 1942). The Supreme Court wrote:

"Unlike men employed in service on the land, the seaman, when he finishes his day's work, is neither relieved of obligations to his employer nor wholly free to dispose of his leisure as he sees fit. Of necessity, during the voyage he must eat, drink, lodge and divert himself within the confines of the ship. In short, during the period of his tenure the vessel is not merely his place of employment; it is the framework of his existence. For that reason, among others, his employer's responsibility . . . extends beyond injuries sustained because of, or while engaged in, activities required by his employment . . . . The assumption is hardly sound that the normal uses and purposes of shore leave are 'exclusively personal' and have no relation to the vessel's business. Men cannot live for long cooped up aboard ship, without substantial impairment of their efficiency; if not also serious danger to discipline. Relaxation beyond the confines of the ship is necessary if the work is to go on, more so that it may move smoothly. . . ." 318 U.S., 731–734, 63 S.Ct. 934, 935.

The Aguilar holding was later analogized to personnel on land in Murphey. The Murphey ruling involved an auto accident in which a civilian was killed by the action of a soldier on recreational leave.

"Sergeant Brander was one of about twenty air corps soldiers encamped about three miles from the town of Klamath in the northern part of the state of California. In order to keep up the morale of these encamped men, a truck was provided for nightly visits to Klamath for their 'entertainment, movies, etc.'" 179 F.2d, at 744.

Plaintiffs argue that Murphey and the instant case are closely analogous in that both represent types of isolation and limited nightly diversion. In finding the government liable under the doctrine of *respondeat superior* (Jones Act), the court, in Murphey, relied upon Aguilar, saying:

"That he was 'directly or indirectly serving his master' in so doing is none the less within the scope of that employment, because he was serving his own desire and that of the other sergeant seeking recreation in taking the latter's two lady friends to the ceremonial." 179 F.2d, at 746.[13]

The import of Aguilar and Murphey, the plaintiffs maintain, is the issue of employer benefit. By virtue of the employee's recreation, they improve their morale and work output, whereby "the superfluous is the necessary . . . to make life livable."[14] For the limited period of training camp "confinement" the players are benefiting both themselves and the team by short breaks from scrutiny, the plaintiffs argue.

The question thus framed is both complex and crucial. In order to establish the Redskins' liability via *respondeat superior* the plaintiffs must establish that Wright was acting within the scope of his employment. As noted, the latter concept requires that the employee's actions benefit the employer in his busi-

13. *But see*, Williams v. United States, 215 F.2d 800 (9th Cir. 1954), where Bone, J., who had dissented in Murphey, distinguishes that case from the Williams case and the panel there finds that the serviceman was not acting "in line of duty" when, on a frolic of his own," he negligently injured another and consequently the United States was held not liable.

14. Holmes, J., dissenting in Tyson & Brother v. Banton, 273 U.S. 418, 447, 47 S.Ct. 426, 434, 71 L.Ed. 718 (1927).

ness relation. Cmwlth. to the Use of Orris v. Roberts, 392 Pa. 572, 583, 141 A.2d 393 (1958); *See also*, n.11, *supra*.

In the words of the Aguilar court, the unique situation "is not merely his place of employment; it is the framework of his existence" 318 U.S., at 732, 63 S.Ct. at 934. The Aguilar decision asserted the need for leave time at the risk of never getting any employees without it. However, the sailors in Aguilar and soldiers in Murphey were captives for a period of time far in excess of the seven weeks of training camp. Nevertheless, this court sees the primary potential benefit to be the morale of the players during a time when the club must build "players mentally and physically ready to play in the NFL season" (Allen deposition, p. 5). The training camp, albeit brief, is all-important to establishing a cohesive mental unity amongst the team-members, a unity apparently not possible were the players free of close contact and scrutiny.

This court finds the employment relationship between Wright and the Redskins to be so unique as to be without parallel. For the fixed period of the football training camp the players' time is accounted for seven days per week and all but two or three hours per day. During that limited "free time" the conduct, dress and associates of the players are circumscribed to the extent that a player can be barred from employment for improper conduct "regardless of whether [it is] . . . directly connected with the team."

If there is a parallel occupation, this court is unaware of it. Indeed, even the soldiers on pass, in the Murphey case, were governed by less stringent and certainly less vague standards of conduct.

Although the fact of employment is not seriously at issue, the nature of that relationship is. The parties have not agreed on the type, nor import of any "free time" controls which might exist over the players. The tone, temper and character of training camp, though in dispute, are such that a jury could find recreation beneficial to player and team alike. Taking plaintiffs' evidence at face value, there is sufficient evidence that the Redskins did "control" the players during free time to deny the Redskins' motion for summary judgment and require a complete exposition of evidence from all sides. Given the jury's role and the disputed facts, this court is of the view that summary judgment would be inappropriate at this juncture.

## SCHMIDT'S MOTION FOR SUMMARY JUDGMENT:

The second motion for summary judgment was filed on behalf of Roy Schmidt, the owner of the vehicle driven by Wright. The extent of Schmidt's alleged negligence was the maintenance of "bald" tires on his car and inadequate warnings to Wright about their condition.

Schmidt's motion for summary judgment is based exclusively upon § 388 Restatement (Second) Torts, which reads:

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

Schmidt contends that as the "supplier" of the car he has satisfied the notice requirement of subsection (c).

The plaintiffs oppose the motion on two grounds. First that Schmidt does

not satisfy subsection (c), and second, that § 308 of the Restatement (Second) Torts, is applicable. Section 308 reads:

"It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others."

As to § 388, the plaintiffs initially dispute whether it has been adopted in Pennsylvania. This court is satisfied that § 388 is good law in Pennsylvania. *See, e. g.*, Incollingo v. Ewing, 444 Pa. 263, 288, n.9, 282 A.2d 206 (1971); Thomas v. Ribble, 404 Pa. 296, 172 A.2d 280 (1961); Dunn v. Atlantic Refining Co., 391 Pa. 65, 69, 137 A.2d 262 (1958).

The depositions of both Wright and Schmidt indicate that an undetermined number of days prior to the accident Schmidt told Wright about the condition of his automobile tires (deposition of Schmidt, pp. 10–11), (deposition of Wright, pp. 32–33). The reasonableness of Schmidt's notice in terms of timing and content is a question of fact for the jury to determine unless the court concludes that as a matter of law the defendant Schmidt "exercised reasonable care to inform" Wright about the tires. The court is of the opinion that the record is not sufficiently developed to conclude that a jury could not reasonably find Schmidt negligent.

Section 308, likewise, presents a factual question closely aligned with that raised in § 388. That is, whether Schmidt knew or should have known that Wright was "likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others." The substance of the plaintiffs' accusation is that Schmidt knew or should have known that Wright had been drinking, that it was raining, and that Wright was bound for a tavern where he was likely to continue drinking before returning to his quarters. Here, too, the matter is for the jury to conclude whether all of the circumstances taken together justified Schmidt turning over control of his car to Wright.

The court is therefore of the opinion that the motion of Roy L. Schmidt for summary judgment should be denied.