Donald CHUY

v.

PHILADELPHIA EAGLES FOOTBALL
CLUB and the National
Football League.

Civ. A. No. 71–1802.

United States District Court,
E. D. Pennsylvania.

April 18, 1977.

Leonard Schaeffer, Pechner, Dorfman, Wolffe & Rounick, Philadelphia, Pa., for plaintiff.

Lindley M. Cowperthwait, Jr., Wisler, Pearlstine, Talone, Craig & Garrity, Norristown, Pa., for defendant Philadelphia Eagles.

Morris L. Weisberg, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for defendant National Football League.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This opinion addresses the post-trial motions of the defendant, The Philadelphia Eagles Football Club (Eagles), to set aside a substantial jury verdict in favor of the plaintiff, Donald Chuy, a former Eagles lineman, on claims of breach of contract and intentional infliction of mental distress.[1] We also consider plaintiff's motion for a new trial on his defamation claim

---

1. The Eagles have moved for judgment n.o.v., Rule 50(b), Fed.R.Civ.P., or, alternatively, for a new trial, Rule 59(a), on both the contract claim and the intentional infliction of mental distress claim.

An antitrust claim pleaded by plaintiff against Eagles and the National Football League was disposed of in our opinion which is reported at 407 F.Supp. 717 (E.D.Pa.1976). Although now urged again by plaintiff, it need not be reconsidered here. We note that since there has been no final judgment, Rule 54(b), the question is still open to us. But the decisions, in *Kapp v. National Football League,* 390 F.Supp. 73 (N.D.Cal.1974), and *Mackey v. National Football League,* 543 F.2d 606 (8th Cir. 1976), do not affect our result due to the narrow basis of our dismissal of plaintiff's antitrust claim.

which the jury resolved in the Eagles' favor. The unusual factual background of this case may be summarized as follows.

On November 2, 1969, Chuy suffered a severe injury to his left shoulder while executing a downfield block in a game against the New York Giants. The full extent of Chuy's injury was not diagnosed, however, until weeks later, when it was discovered that he had developed an acute pulmonary embolism. After hospitalization and treatment the embolus was dissolved, but Chuy's career in football had been brought to an end.

Chuy's contractual claim is set against the peculiar practice, in effect in the National Football League at the time of the operative events of this case, whereby players would sign on the same day two or more separate NFL Standard Player Contract forms for two or more successive years. Thus, on June 16, 1969, Chuy signed three separate documents bearing respectively the dates of the 1969, 1970, and 1971 seasons. Each contract provided for $30,000 compensation and guaranteed him full salary for the contract term in case of a disabling football related injury. The Eagles maintain that this arrangement was for three separate one-year contracts conditioned upon Chuy's making the team each year. Chuy on the other hand contends that his dealings with the Eagles created a three-year contract and that, because the Eagles had not paid him for the 1970 and 1971 seasons, they owe him $60,000. Finding ambiguity in the documents taken together, we admitted parol evidence pertaining to the negotiations between the parties. The jury believed Chuy's version of the facts and awarded him the sought-for $60,-000, less the sum of $15,000 which the Ea-gles had loaned to him and which he had not repaid.

The bizarre aspect of the case lies in the facts underlying Chuy's claim for intentional infliction of mental distress. After Chuy had recovered from the acute phase of his injury and had been examined by Eagles' physicians to determine his ability to play again, he returned to his home in Los Angeles, California. Chuy's condition was a matter of interest to Philadelphia sports fans and sports writers, particularly because he had been the subject of a prominent trade the previous year under the terms of which he had been brought to the Eagles and Bob Brown, an All-American All-Pro Lineman, had been sent to the Los Angeles Rams. Accordingly, Hugh Brown, a Philadelphia Bulletin sports writer, interviewed Eagles General Manager Palmer "Pete" Retzlaff and Eagles Team physician Dr. James Nixon on the matter. What resulted was a story in the Bulletin and, via the wire services in newspapers all over America, reporting that Dr. Nixon had stated that Chuy was suffering from a rare blood disease known as polycythemia vera which would prevent him from playing professional football again.[2] Chuy read the article and became panic stricken. He consulted his personal physician, Dr. John Perry, also team physician for the Los Angeles Rams. Dr. Perry explained the serious nature of polycythemia vera, and though he counseled Chuy that in his opinion he was not suffering from the disease and suggested tests to rule it out conclusively. Chuy was inconsolable. Chuy testified to experiencing thereafter a lengthy period of extreme emotional anguish and torment during which he anticipated death.[3]

2. According to the trial testimony polycythemia vera is a disease characterized by a striking increase in red cell mass and total blood volume. Although the disease is ultimately terminal life may be prolonged for many years with treatment. While it was absolutely clear that Chuy did not have this serious disease, there was some question in the minds of the Eagles consultant Dr. Harrell whether he may have suffered from stress polycythemia which is a form of related polycythemia observed in active, anxiety-prone individuals, in whom there is a moderate increase in the red cell mass. See N.T. Perry 30–31; N.T. 5th & 6th Day 341.

3. When Chuy ultimately became satisfied that he was not suffering from polycythemia vera he concluded that Dr. Nixon's statement was a part of a conspiracy to undermine his contract claim, for if Chuy was forced to leave football because of polycythemia vera (or some such disease) and not because of a football injury,

It was conceded by the Eagles at trial that Chuy did not have and indeed never had polycythemia vera and that Dr. Nixon knew that he did not have it. This concession was consistent with the Eagles' defense because Dr. Nixon testified that he had never told Mr. Brown that Chuy had polycythemia vera. However, the jury credited Mr. Brown's testimony that Dr. Nixon made the statement. The jury also found, in answer to a special interrogatory, that the Eagles had actual control or the right to control the substance of Dr. Nixon's statements to the press about the conditions of Eagles players. Finding that the record facts established that Chuy was a public figure and that the constitutional privilege defense of *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny should be accorded even to a non-media defendant such as the Eagles, we applied a "clear and convincing" standard in our instructions and special interrogatories. Nonetheless, the jury answered most of the interrogatories favorably to Chuy. In accordance therewith a verdict was rendered for Chuy against the Eagles [3a] for intentional infliction of mental distress, the jury awarding Chuy $10,000 as compensatory damages and $60,590.96 as punitive damages. Chuy had also sued for defamation. Because the jury found that Dr. Nixon's statements were not understood by Hugh Brown (the recipient) as defamatory, a requirement of Pennsylvania law, we molded a verdict for the Eagles on the defamation claim.

The Eagles have asserted a variety of grounds in support of their post-trial motions. With respect to the contract claim, as we have indicated above, they mainly contend that the documents in question should have been construed as three one-year contracts as a matter of law; that we should not have permitted introduction of parol evidence; and that in any event there was no evidence to support the verdict. With respect to the mental distress claim,

defendant mainly argues that there was no evidence of a master-servant relationship and that the Eagles cannot therefore be held vicariously liable for Dr. Nixon's statements to the press. As will appear from the discussion below, Chuy's evidence on both these points was thin, but it was enough to permit the case to go to the jury and to support its verdict.

The Eagles also urge that the presence in the jury room of a book entitled *What You Need to Know for Jury Duty,* by Godfrey Lehman, prejudiced their case, and that our instruction to the jury not to make any use of the book in response to the jury's inquiry whether it could be used was prejudicial to defendants because it took place in the absence of counsel. Moreover, the Eagles assert that the way in which the special interrogatories to the jury were framed prejudiced their case because the jury could ascertain from their structure which answers were the "correct" ones and because the jury was misled into thinking that Chuy would get no contract damages, thus encouraging the jury to increase the punitive damage award for the infliction of mental distress. The Eagles have also raised a question as to the size and overall propriety of the punitive damage award. The plaintiff, in his motion for a new trial on the defamation claim, argues that we erred in finding that Chuy was a public figure and in instructing the jury in accordance with the strict standard of *New York Times v. Sullivan,* under which the plaintiff was obliged to prove "malice" in order to recover.

While the parties have asserted other grounds in their moving papers and briefs, the foregoing are the only points requiring discussion. The trial consumed 10 days and was interrupted by numerous colloquys; hence, the basis for most of our challenged rulings is already amply spread upon the record. For the reasons which follow, defendant's post-trial motions (and plaintiff's

then he would not be entitled to the $60,000 salary for the two remaining contract years. At least he so argued to the jury. *See* discussion *infra.*

3a. Dr. Nixon was not a defendant.

as well) are without merit. An order denying them has previously been filed and this opinion explicates our reasoning.[3b]

## II. Discussion

### A. The Contract Claim

In order to present fully the questions which defendant has raised in its motion for judgment n.o.v. or a new trial on plaintiff's contract claim, it will be necessary to examine the three contract forms which defendant and plaintiff signed, the difficulties of interpretation arising from their apparently overlapping application, and the procedures followed at trial regarding proof by parol evidence.

Chuy, of course, had to demonstrate at trial that the three separate "Standard Player Contract" forms established an overall contractual arrangement by which the Eagles Football Club was obligated to him for his salary over three football seasons, and that, by virtue of the injury clause (paragraph 14) upon the occurrence of a disabling injury in the course of his football activities in 1969 he became entitled to receive his salary for the 1970 and 1971 seasons.

█ We note preliminarily our threshold conclusion that the correct interpretation of the separate forms in this case necessarily depended upon a consideration of all three forms together, for despite the use of separate forms it is the combination which here embodies the rights and duties of the Eagles Football Club and Don Chuy vis a vis each other over three years.[4] *See, e. g., International Mill Co. v. Hachmeister, Inc.,* 380 Pa. 407, 110 A.2d 186, 191 (1955); *Chicago Pneumatic Tool Co. v. Ziegler,* 151 F.2d 784, 795 (3d Cir. 1946) (interpreting Pennsylvania law); *Stern and Co. v. State Loan*

and *Finance Corp.,* 238 F.Supp. 901, 911 (D.Del.1965) (interpreting Pennsylvania law). This view is also in accord with the law of other jurisdictions than Pennsylvania. *See Lowell v. Twin Disc, Inc.,* 527 F.2d 767, 769–70 (2d Cir. 1975); *St. Paul Fire and Marine Insurance Co. v. Tennefos Construction Co.,* 396 F.2d 623, 628–29 (8th Cir. 1968). *Lawrence v. United States,* 378 F.2d 452, 461 (5th Cir. 1967); *Phoenix Title and Trust Co. v. Stewart,* 337 F.2d 978, 983 (9th Cir. 1964), *cert. denied,* 380 U.S. 979, 85 S.Ct. 1335, 14 L.Ed.2d 273 (1965); *Century Refining Co. v. Hall,* 316 F.2d 15, 21 (10th Cir. 1963).

The Eagles have argued that the documents are clear on their face in creating three separate one-year agreements, with the result that, since Chuy did not make the team in 1970 they are not obligated to him. The problem with that contention and the need for parol evidence to resolve the ambiguity created by the three documents can be demonstrated by referring to the third of those documents, in which the year "1971" is typed into the first paragraph. The pertinent language is as follows:

> the term of the contract shall be from the date of execution hereof .[June 16, 1969] until the first day of May following the close of the football season commencing in the calendar year 1971 . . . .

The salary figure appearing in paragraph 3 is $30,000 payable as follows:

> 10.0% of "said amount in equal semi-monthly installments commencing with the first regularly scheduled League game played by the Club during each season and continuing each semi-monthly period thereafter . . . .

Paragraph 14 requires that following a disabling football related injury salary will

---

**3b.** On January 31, 1977, we entered an order denying the post-trial motions of defendant and plaintiff with the notation that (this) Opinion would follow. We did so in the interest of justice to expedite appeal at a time when we were engaged in other pressing matters which would delay the completion of the Opinion.

**4.** *See* 3 Corbin, *Contracts* § 549, at 190–92 (1960):

> A transaction may be tri-partite or even more complex, a factor that must not be disregarded in the process of interpretation of any of the documents. Of course, documents and other circumstances should also be used in this process, so far as they are relevant to the issue, even though they form no part of any so-called "integration" . . . . [Footnote omitted.]

continue "during the term of this contract . . . as provided in ¶ 3 . . . ." Paragraph 14, the key clause in the contractual part of the case, also states:

> If Player is injured in the performance of his services under this contract, this contract shall remain in full force and effect despite the fact that Player, following injury, is either carried by the Club on its Reserve List or is waived out as an injured player while injured . . . .

The two other forms are in all respects the same, except that the term of one runs from execution in 1969 through the 1970 season and the term of the other runs only through the 1969 season.

The result of the foregoing is that these contracts could be construed on their face to create contemporaneously running one-year, two-year, and three-year contracts, thus providing Chuy $90,000 for his first season (1969), $60,000 for his second season (1970), and $30,000 for his third season (1971). Because this would seem to be a most peculiar, if not absurd, result (which neither party has urged) and because no other meaning clearly appears, we concluded that the meaning of paragraph 14 when the documents were read together was highly ambiguous. Because of the ambiguity, we held that evidence of prior and contemporaneous negotiations which did not contradict or alter the plain terms of the contract forms would be admissible at trial in order to provide a basis for determining the manifestation of the parties' intent.[5] See In re Herr's Estate, 400 Pa. 90, 161 A.2d 32 (1960).[6] see Lowell v. Twin Disc, Inc., 527 F.2d 767, 770 (2d Cir. 1975) (interpreting New York law). The issue of what the parties agreed to was, within this framework, submitted to the jury as the finder of fact. See, e. g., BBCI, Inc. v. Canada Dry Delaware Valley Bottling Co., 393 F.Supp. 299 (E.D.Pa.1975); Framlau Corp. v. Upper Dublin School Authority Board, 219 Pa.Super. 369, 281 A.2d 464 (1971).

The Eagles in their post-trial brief continued to maintain that the separate forms should have been interpreted independently of one another and that there is no ambiguity since the contracts clearly limit their applicability to one football season each. By this theory Chuy would be entitled to nothing for the 1970 and 1971 football seasons, because the salary "during the term of this contract" (paragraph 14) would only mean the salary due under the claimed single contract applicable to the 1969 season— the season in which the plaintiff's injury occurred. While the parties might have agreed clearly to such a plan under some form of contract, we believe the defendant's contention, as based upon the documents before us, is untenable. The (third) contract document which defines the term of duration as 1969 to 1971 itself negates defendant's approach when juxtaposed with the verbiage of paragraph 14: to give each

---

5. The Eagles' contention that we erred in admitting parol evidence is bottomed mainly upon Sample v. Gotham Football Club, 59 F.R.D. 160 (S.D.N.Y.1973), where the court was presented with what appears to be the identical issue now before us. That court concluded that the three executed forms were three distinct and independent contracts, and that each one applied to one discrete football season. The court observed, without quoting paragraphs 1 or 3, that "[t]he intent of the parties is clearly manifested by the three separate executions, and because each contract pertains to a single football season." Id. at 164. We respectfully disagree, for it is certainly not clear to us that the contract forms defining their respective terms of duration as 1969, 1969–1970, and 1969–1971 apply, as written, to one season only.

6. The court observed, 400 Pa. at 93–94, 161 A.2d at 34:

> The Court in interpreting a will or a contract can always consider the surrounding circumstances in order to ascertain the intention and the meaning of the parties. Moreover, where an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances. [Citation omitted.]

In addition, Hennigan v. Chargers Football Co., 431 F.2d 308 (5th Cir. 1970), also cited by defendant, is plainly distinguishable in its denial of an injured player's salary claim. Hennigan involved the exercise of the renewal provision after the last season in a multiyear contract.

contract a purely independent interpretation would be to create a fundamental contradiction to the effect that the contracting parties agreed in three separate contracts to matters already covered on the face of just one of those agreements. We conclude (1) that the contract forms must be construed together, for to do otherwise would be simply to produce an insensible result;[7] and (2) that we were correct in admitting parol evidence on the subject of the parties' otherwise ambiguous intentions.[8]

We turn now to the question of sufficiency of the evidence to support the verdict. That question, more precisely stated, is whether the verdict on the plaintiff's contract claim (as molded from the jury's answers to special interrogatories) is, as the Eagles maintain, against the clear weight of the evidence such that the conclusion drawn by the defendant is the only reasonable one, without weighing the credibility of witnesses, *Eisenberg v. Smith*, 263 F.2d 827 (3d Cir.), *cert. denied*, 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534 (1959). We must now review the evidence upon which the jury could have based its decision.[9]

The testimony of the plaintiff Donald Chuy and former Eagles General Manager Palmer ("Pete") Retzlaff who negotiated the Chuy contract is central to this task. To summarize, Chuy testified that Retzlaff, in presenting the three standard forms, told Chuy he was acquiring a three-year contract, and that Retzlaff repeatedly described the agreement as a $90,000 package (N.T. Chuy 36). Chuy also testified that he expressed his interest in the security of such a contract. Retzlaff, on the other hand, denied in his testimony that he referred to any "three year package," (N.T. Retzlaff 10), and, in general asserted that he at no time spoke of a three year agreement. The resulting disagreement thus presented a credibility question for the jury which they resolved in Chuy's favor. While the evidence for Chuy's position was not strong, certainly Chuy's testimony was some evidence from which the jury could have inferred that the parties at the time of contracting mutually manifested an intent to enter into a comprehensive financial arrangement to cover all three years rather than a step by step progression by which each year would be treated independently. In addition, there was testimony by Gloria Jurgelewicz, formerly the secretary to the Eagles owner Leonard Tose, that she over-

---

7. *Small v. Small*, 185 Pa.Super. 468, 137 A.2d 870, 873 (1958), cited by defendant, wholly supports this view. In *Small* the issue was whether a child support contract between husband and wife was separate from a contract for the wife's monthly allowance. Having found that the parties intended separate agreements, which were sensible when viewed independently, the court gave them independent treatment.

8. We note that the contract can only be based upon the parties' manifestation of their intentions, and not upon their subjective intentions. *See, e. g., Delaware L. & W. R. Co. v. Water Power & Supply Co.*, 227 Pa. 639, 76 A. 425 (1910).

9. Although the jury was not given the contract forms to examine during their deliberations, we explained in our instruction to the jury the source of the ambiguity which we found. There appeared to be no reason to risk confusing the jury in a complicated case grounded on several legal theories by giving them three detailed contract forms over which to pore and ponder. The jury was therefore instructed, as we preliminarily found, that the three contract forms were, through their paragraph one, apparently overlapping; that one of those forms could on its face apply to three seasons, another to two seasons, and another to only one; that the operation of paragraph 14 was therefore unclear to us; that based upon this arrangement the question of what intent the parties manifested by their prior or contemporaneous expressions was left to the jury to determine after considering the testimony at trial. (N.T. Ninth Day 591-594). The jury was also instructed that they were not to construe or interpret the aspects of the written agreements which we described to them, but rather to accept the facial ambiguity as stated and proceed from there. By this means we sought to make clear that the court was not permitting the jury to make what would in essence be a legal decision solely on the facially conflicting contract terms. Under the circumstances, we believe that an appropriate division between the functions of the court and jury was preserved and that the exercise of our discretion in withholding the contract forms from jury room use was proper. *See, e. g., Murray v. United States*, 76 U.S.App.D.C. 179, 130 F.2d 422 (1942).

heard Tose say to Retzlaff, after Chuy had demanded the additional $60,000 and before the Eagles formally rejected the claim, that "there is no way in hell we are going to pay him that money, *the remainder of his contract.*" (N.T. Jurgelewicz 7, 21) (emphasis supplied). This testimony, too, constitutes some evidence by way of admission that the $90,000 package deal to which Chuy claimed entitlement was agreed to by the Eagles.[10]

■ Given the ambiguity in the parties' contractual association (deriving from the use of three facially overlapping documents), we think that this testimony provided sufficient evidence to support the jury's view that a $90,000 obligation was mutually intended and that an injury in the course of Mr. Chuy's football duties would establish defendant's liability for the total amount remaining.[11]

■ As we have observed above, a district court, when faced with a motion for judgment n.o.v., may not lightly regard a jury's evaluation of the facts of a case.[12] *Eisenberg, supra.* We must consider the evidence and all permissible inferences most favorably to the party benefiting from the verdict "and the motion must be denied if, so viewed, reasonable men might differ as to the conclusion of fact to be drawn." C. A. Wright, *Law of Federal Courts* § 95, at 473 (3d ed. 1976). Under this standard, defendant's motion for judgment n.o.v. must be denied. We also deny the defendant's motion for a new trial on the contract claim because of the absence of a substantial legal or evidentiary or other defect in the conduct of the trial pertaining to that matter. Rule 59(a), Fed.R.Civ.P.

## B. The Intentional Infliction of Mental Distress Claim

The Eagles have also moved for judgment n.o.v. or a new trial on plaintiff's intentional infliction of mental distress claim. The legal theory upon which the plaintiff rested this claim derives from *Restatement (Second) of Torts* § 46 (1965) which provides as follows:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. . . .

*See Papieves v. Lawrence,* 437 Pa. 373, 263 A.2d 118 (1970).

The Eagles argument has several facets. First, the Eagles assert that there is insufficient evidence to sustain a finding of intent or recklessness on the part of Dr. Nixon. Second, the Eagles contend that plaintiff failed to prove that his distress in response to the alleged statement was "reasonable" in accordance with the directive of comment *j* to *Restatement (Second) of Torts* § 46. Finally, the Eagles argue that even if Dr. Nixon made the statement that Chuy had polycythemia vera and even if the requisite state of mind had been shown, Dr. Nixon was an "independent contractor" unable to create any liability on the part of the employer. We will examine defendant's arguments in turn.

10. The jury was also asked whether there was a custom in the National Football League as to documents signed on the same date and relating to successive seasons, by which a player who sustained football related injuries in one season was understood to be limited in his recovery of salary to that remaining for the season in which the injury occurred. The jury answered "no." Special Interrogatory 2. The jury also concluded, in responding to Special Interrogatories 4(a) & (b) that both Retzlaff, former Eagles general manager, and Chuy understood that a disabling football related injury in 1969 would require payment of salary for 1970 and 1971.

11. The jury found by its answers to Special Interrogatories 5(a) & (b) that Chuy's inability *to play football for the Eagles during the 1970 and 1971 seasons stemmed from the football related injury sustained while playing for the Eagles in 1969.*

12. Indeed, it may be fairly said that the jury's answers to specific interrogatories enhance the value of their determination somewhat by demonstrating that the jury's attention was directed to particular matters on which particular judgments were made. *See Eckenrode v. Pennsylvania R. Co.,* 164 F.2d 996, 997 (3d Cir. 1947) (Goodrich, J.), *aff'd,* 335 U.S. 329, 69 S.Ct. 91, 93 L.Ed. 41 (1948).

The theory on which the plaintiff proceeded at trial in order to establish the defendant's liability for mental distress was that Dr. Nixon, knowing that Chuy did not have polycythemia vera, nonetheless told a representative of the press that Chuy had the disease and that he must therefore leave professional football. As we have noted above, Hugh Brown, the reporter for the Philadelphia Bulletin who publicized Dr. Nixon's alleged statement, testified that Dr. Nixon did in fact make the statement as reported. The plaintiff asserted, and it was not disputed, that Donald Chuy never had and was never diagnosed as having polycythemia vera. Seeking to relate these factors to his theory of the case, plaintiff contended (see, n.3 supra ) that it was in the Eagles' interest to publicize that Chuy was suffering from a disease unrelated to football, for that position might enhance the Eagles' leverage in dealing with Chuy's contract claim.

▆▆▆ Viewed as a whole, the plaintiff produced sufficient evidence from which the jury could, if it wished, draw the inference that Dr. Nixon intentionally or recklessly inflicted upon Donald Chuy mental distress and that such conduct was outrageous. It was Dr. Nixon's testimony that he never said to Hugh Brown that Chuy had polycythemia vera,[13] and that he knew quite well what that disease was, so that, on this record, there was no inadvertent misdiagnosis. When viewed against the testimony of Hugh Brown, it seems clear that if the jury chose to believe Hugh Brown, there was little to hinder it in accepting the inferences which plaintiff argued must be drawn. To grant the defendant's motion for judgment n.o.v. would be to usurp the jury's right to decide issues of

credibility. See Eisenberg, supra. Our agreement or disagreement with the jury's judgment in this case can have no bearing upon our decision.

Next, in accepting as true (for purposes of evaluating defendant's motions) the allegations which plaintiff made which are fairly supported by the evidence, we must also reject the Eagles' argument that the statement by Dr. Nixon was not as a matter of law so outrageous as to create liability. Announcing to the press that an unsuspecting young athlete has a serious disease when there was no basis for such a conclusion does not comport with any tolerable standard of decency, and is plainly within the scope of § 46.

▆▆▆ We also cannot agree with the related argument that the effect of comment $j$[14] is to set up a reasonableness standard by which the victims of outrageous conduct must be judged at the risk of losing their cause of action. The very essence of plaintiff's claim is that he was subjected to a devastating period of mental stress. In providing an action for such victims on the one hand, the law does not taketh away by the other. One who has been subject to such mental stress will thus not lose his action because his subsequent conduct may not in the cool ambience of hindsight appear to satisfy ordinary expectations of reasonableness. What comment $j$ suggests, we think, is something which we have already indicated, that one who brings suit asserting the intentional infliction of mental distress may be barred if the *mental distress itself* was an unreasonable or peculiar reaction, and not because the victim of truly outrageous conduct who is in fact distressed did not act as would a reasonably prudent man to mitigate his hardship.[15] As we have

---

**13.** We frankly had anticipated that Dr. Nixon would testify that he had made a verbal slip in referring to polycythemia vera instead of referring to stress polycythemia (see n.2 supra ), which Chuy arguably may have had.

**14.** Comment *j, Restatement (Second) Torts* § 46, p. 78, states in part as follows:
The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exag-

gerated and unreasonable emotional distress unless it results from a peculiar susceptibility to such distress of which the actor has knowledge.

**15.** We instructed the jurors that if they found that Chuy's reaction to the incident in question unreasonably increased his plight, they could reduce his damage award. N.T. at 615. Thus we charged on mitigation of damages, while

already pointed out, the evidence supports the jury's finding that Chuy was subject to outrageous conduct.

Finally, we must consider whether Dr. Nixon's acts can create liability on the part of the Eagles given Dr. Nixon's position as team physician. The threshold question is, of course, whether Dr. Nixon was a "servant" or an "independent contractor," for if he is merely the latter the Eagles would be insulated from a judgment based upon his statement.

In *Mauk v. Wright,* 367 F.Supp. 961 (M.D. Pa.1973) (Herman, J.), the definition of a "master-servant" relationship under Pennsylvania law was discussed at some length. That court observed that Pennsylvania law requires that the employer possess the following in order for the relationship to arise:

(1) the right . . . to select [the] employee;

(2) the right and power to remove the employee;

(3) the power to direct what the employee will do and the manner of performance;

(4) and the potential power to control the employee. [Citations omitted.]

The court further elucidated (citing *Ragano v. Socony Vacuum Co.,* 376 Pa. 271, 274, 101 A.2d 686 (1954)) that "[c]orrelative to control is the right to dictate the way in which a task shall be performed." *Mauk* at 967.

■ The plaintiff concedes that the Eagles had no right to control the way in which Dr. Nixon treated an injured player or the manner in which he performed surgery—even though the Eagles did have the power to select and remove Dr. Nixon from his position with the team. In a suit arising from the exercise of those physician func-

tions, we do not doubt that Dr. Nixon would be viewed as an independent contractor. *See Commonwealth v. Minds Coal Mining Corp.,* 360 Pa. 7, 60 A.2d 14 (1948); W. Sell, *Agency* § 95, at 87 (1975). But we are not here concerned with Dr. Nixon's conduct *qua* physician-surgeon, but as spokesman for the Eagles to the press respecting the physical condition of Eagles players.[16] And, there is evidence in the record from which the jury might fairly have concluded that the Eagles in the ordinary course of business delegated to Dr. Nixon the quite separate task of informing the media about the physical condition of Eagles players, and that the Eagles had in addition to the power to hire and fire, the power to cause Dr. Nixon to refrain from making statements at certain times, the power to direct the manner of his performance and the potential power to control the substance of any announcements.

The testimony of Hugh Brown revealed that Dr. Nixon as team physician often provided him with information on the player's physical condition. (N.T. Brown at 17–18). Pete Retzlaff testified that Dr. Nixon's practice of releasing information was known to him, at least to some extent, and that it was outside the Eagles' normal public relations procedure in making medical announcements.[16a] Mr. Retzlaff testified further that he suggested to Dr. Nixon that he follow the normal procedure but "never really saw any reason to enforce that." (N.T. Retzlaff 32–33). Dr. Nixon testified that whenever he spoke to the press it was with the full knowledge of the Philadelphia Eagles (N.T. Nixon 464). Dr. Nixon also testified that the Eagles on one particular occasion did seek to control his release of information, (N.T. 465),[17] while further tes-

---

making it clear that failure to mitigate would not defeat the cause of action itself.

**16.** Even the defendant in its Post-Trial Brief at 48 states as follows:

In the context of professional football, as set forth earlier in this brief, conversations between the team, or team physicians, and the press relative to the physical condition of the football players are commonplace and essential.

**16a.** The normal public relations procedure was for press releases to be issued by the Eagles after consultation with the physician.

**17.** The single instance of control occurred at the behest of Joe Kuharich, Retzlaff's predecessor as General Manager (Kuharich was also head coach). Kuharich told Dr. Nixon that he should not speak to the press on Sunday because Kuharich would speak to the press himself on Monday. (N.T. Nixon 465).

tifying that he would frequently speak to the press without admonition (N.T. 466–68) and that by his agreement with the Eagles what was to be said to the press about a player's health was to be his exclusive province (N.T. 449–50).

Certainly this evidentiary fabric survives defendant's judgment n. o. v. attack upon the substantiality of all of the evidence. Conceivably, the jury may have concluded that Dr. Nixon was acting on behalf of an intentionally acquiescent Eagles Club, or even at the direction of the Club. The jury may have concluded that the Eagles had the power to implement whatever controlling regulations it chose, and/or that the Eagles management could have required Dr. Nixon to review with the management the substance of a news report, or could have told him to say nothing at all, to be very detailed or very terse in his medical explanation, to delay his release or to hasten it, etc. Indeed, the Eagles could have instructed Dr. Nixon to talk to Chuy before releasing any information. In all these respects the Eagles may have retained a considerable right of control over the manner of Dr. Nixon's performance in speaking to the press.

In view of the foregoing, though we might well have come to the opposite conclusion had we been the trier of fact, and though the evidence on this point is far from strong, we cannot say that the jury could not have inferred from the evidence that the Eagles possessed actual control or the right of control over the substance of Dr. Nixon's statements to the press on the conditions of Eagles players.[18] Defendant's motion addressed to this ground must therefore be denied.[19]

## C. The Defamation Claim (Plaintiff's Motion for New Trial)

Having treated the two major bases for the Eagles' post-trial motions, we must now consider (upon plaintiff's motion for new trial) whether Donald Chuy was correctly viewed as a public figure and thus whether it was proper to instruct the jury in accordance with the strict standard of *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), by which the public figure or public official plaintiff must prove "malice" in order to recover.[20] We must also examine defend-

---

**18.** We have discussed the Eagles' liability in terms of *respondeat superior* even though plaintiff argued that the Eagles were actively involved in the statement by Dr. Nixon because in the absence of a recommendation by plaintiff's counsel to do so none of the interrogatories to the jury asked whether the Eagles management was an active participant. This does not, however, detract from the evidentiary basis for the jury's finding that Dr. Nixon committed an intentional or reckless infliction of mental distress, for the jury may still have inferred that Dr. Nixon acted in accordance with the wishes of the Eagles management. The Eagles liability thus is limited at this stage to the vehicle of *respondeat superior,* the only theory covered in the special interrogatories.

**19.** In reference to all of defendant's mental distress arguments we have denied the motion for judgment n. o. v. (rule 50(b)) because of our view that the evidence did not warrant such a judgment. And we have denied the motion for new trial (rule 59(a)) because, in view of the foregoing analysis, no justification for granting such a motion appeared.

**20.** An included question is whether a non-media defendant such as the Eagles is entitled to the *Times* standard. Plaintiff has not raised this point in his motion, but we deem it appropriate to record the conclusion we reached in an adversary posture at trial that it is. See discussion in *Davis v. Schuchat,* 166 U.S.App. D.C. 351, 510 F.2d 731, 734 n.3 (1975); *cf.* Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer,* 61 Va.L.Rev. 1349, 1404–05 (1975). As the Second Circuit Court of Appeals stated in *Schuchat:*

> Our understanding of *New York Times* and its offspring is that private persons and the press are equally protected by the requirement that false comment about public figures must be knowing or in reckless disregard of the truth in order to be actionable. It seems to us a necessary corollary that comment about public figures should be equally protected whether made in mass media or in private. This is required both by the First Amendment, which speaks equally of freedom of speech and of the press, and by common sense, for if the "press" were given more protection than "private speech," persons would be encouraged to rush allegations into wide publication rather than to carefully present them to informed parties for verification or refutation in a more private setting.

ant's argument that our refusal to permit the jury to consider in the jury room the entire newspaper article [21] containing the "polycythemia vera" reference and other remarks by Dr. Nixon was in error.

### 1. *Chuy as a Public Figure*

Few would deny that Donald Chuy was a public figure in the ordinary sense of that word, for (as the record before us on this subject confirms) he was a prominent professional athlete, frequently the subject of sports news.[22] Not only was Chuy an active professional football player, first for the Los Angeles Rams and then for the Philadelphia Eagles, but he was also a professional wrestler of some note. In both athletic capacities Chuy was regularly in the public view. When Chuy came to the Eagles in the Bob Brown trade (and because of it) interest in him in the Philadelphia area was heightened.

The focus of plaintiff's argument is that, based upon *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), Donald Chuy is not a public figure in the legal sense and that he is not bound by the requirement of *New York Times v. Sullivan* that a public figure plaintiff must prove a defamatory falsehood made with knowledge of its falsity or in reckless disregard of the truth. *Gertz, supra* at 342, 94 S.Ct. 2997. We thus turn to an analysis of *Gertz* and a discussion of the definition of a public figure in the context of the First Amendment.

■ *Gertz* provided the following instructional description:

> For the most part those who attain [public figure] status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.

*Id.* at 345, 94 S.Ct. at 3009. From this description we glean a basic requirement that to be a public figure ordinarily an individual must have voluntarily placed himself before the public eye, for the mere eruption of a controversy about a particular person cannot justify the attenuation of a state's interest in the protection of reputations.

■ In referring to the eminence of the position of the public figure in the "affairs of society," however, *Gertz* gave the appearance of contemplating an issue oriented characterization of a public figure. Justice Rehnquist's plurality opinion in *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), itself may have appeared to treat this latter reference as if it

---

We also note that the very purpose of the media is to inform private persons (the public) and facilitate effective discussion and consideration of the events of the day. In terms of the First Amendment policies underlying *Times* and the hallowed role of private dialogue in our society, it seems inappropriate to us to distinguish media from non-media speech and to elevate the media's role in aiding the public in its discussion above private discussions occurring in everyday life.

**21.** The article at issue is Brown, *Illness Ends Chuy's Career*, Philadelphia Bulletin, April 9, 1970, Plaintiff's Exhibit P–1.

**22.** The Eagles offered into evidence numerous articles demonstrating that Chuy was the center of a many a sports writer's attention. A few of the articles about Chuy are: Damer, *Clemson's Don Chuy Hits Football Foe Like Sledge*, Chicago Tribune, July 22, 1962 (Defendant's Exhibit 1); Zeff, *Chuy Late for Vows*, Los Angeles Times, Feb. 11, 1964 (Defendant's Exhibit 3); Florence, *'Rasslin' Rams' Crash Big Time*, Los Angeles Times, Mar. 10, 1965 (Defendant's Exhibit 6); Cox, *Chuy Mixes Sports*, Dallas Times Herald, April 12, 1965, (Defendant's Exhibit 4). Rosenbaum, *A Striker On the Mat*, San Francisco Chronicle, July 5, 1968 (Defendant's Exhibit 13); Florence, *Eagles Bob Brown Traded to Rams: Cross, Carollo, Chuy Included in 5-Man Swap*, May 13, 1969 (Defendant's Exhibit 7); Brogan, *Eagles Chuy Is Tough To Trap*, Philadelphia Bulletin, June 17, 1969 (Defendant's Exhibit 8); Padwe, *Chuy a One-Man Vaudeville Act*, Philadelphia Inquirer, July 31, 1969 (Defendant's Exhibit 9); Brown, *Eagles 'Move' Chuy, Add Johnson*, Philadelphia Bulletin, Dec. 12, 1969 (Defendant's Exhibit 11).

were an essential criterion in every case, observing that the plaintiff in *Firestone* "did not thrust herself to the forefront of any particular public controversy in order to influence the resolution of the issues involved in it." *Id.* at 453, 96 S.Ct. at 965. We do not believe, however, that these references were meant to signify that in all cases the First Amendment (hence the standard of *New York Times v. Sullivan*) is applicable only where there exists an identifiable issue for resolution. We believe instead that the language in *Gertz* to which Justice Rehnquist referred was meant to be in contradistinction to the holding of *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (overruled in *Gertz*), which had the effect of treating as public figures those who were involuntarily thrust into the public sphere because of some controversial issue or event. *Gertz'* underlying concern was that such an approach might render *anyone* a "public figure" who was written about or spoken about, hence possibly libeled or slandered, in the media. Where a person has, however, *chosen* to engage in a profession which draws him regularly into regional and national view and leads to "fame and notoriety in the community," even if he has no ideological thesis to promulgate, he invites general public discussion. We obviously cannot say that the public's interest in professional football is important to the commonweal or to the operation of a democratic society in the same sense as are political and ideological matters. However, the fabric of our society is rich and variegated. As is demonstrated by the Nielsen ratings, the American public is fascinated by professional sports. In view of that fact we must affirm the proposition that interest in professional football must be deemed an important incident among many incidents, of a society founded upon a high regard for free expression.

We consider it unacceptable for a court in determining whether a particular individual is a "public figure" to pass qualitatively upon the "affairs of society." [23] If society chooses to direct massive public attention to a particular sphere of activity, those who enter that sphere inviting such attention must overcome the *Times* standard. Society's interest inspires comment in the press and elsewhere. [The greater the interest, the greater is the public's self-generating need for the facts.] [This is especially so in this case where the subject matter pertained to Donald Chuy's ability to continue playing professional football, a matter in which the sports loving public had a not insignificant interest.] The *Times* rule applies to this kind of case, and we cannot now attempt to alter that rule, which has been fashioned to balance broad social interests.

### 2. Submission to the Jury of Materials for Jury Room Inspection

Plaintiff also argues that we committed reversible error "in refusing the [sic] allow the jury to consider the entire article containing the defamatory statements." Plaintiff's Post-Trial Brief at 4. We did not refuse altogether to submit the article to the jury for examination in the jury room, for the record reveals that we provided the exhibit of the article to the jury. However, we instructed the jury to consider only quotations of Dr. Nixon's statements. The other matter in the article (including a reference to Chuy's "three year contract") was not pertinent to the defamation claim and could not fairly have aided the jury in determining the context in which Dr. Nixon's remarks to Hugh Brown were uttered. *Cf. e. g., Fram v. Yellow Cab Company of Pittsburgh*, 380 F.Supp. 1314, 1329 (W.D.Pa. 1974) (context is relevant factor under

---

**23.** Indeed, one of the reasons why the court abandoned the *Rosenbloom* approach was that the task of defining the issues which were of "general or public interest" should not be left to the "conscience of judges." *Gertz*, 418 U.S. at 346, 94 S.Ct. 2997. In view of this conclusion, we certainly do not believe that *Gertz* or

*Firestone* require us to determine qualitatively the matters which are appropriately "affairs of society," for such a requirement would merely put the rejected *Rosenbloom* approach under another label. *See Firestone*, 424 U.S. at 455–56, 96 S.Ct. 958.

Pennsylvania law). Moreover, it could have prejudiced the Eagles in connection with the contract claim. Since the newspaper was not a defendant, what we permitted the jury to consider was plainly the only relevant area of the article.

We emphasize that it is largely in the discretion of the trial judge to submit material to the jury for their consideration in the jury room. *See, e. g., United States v. Gross,* 451 F.2d 1355 (7th Cir. 1971); *Murray v. United States,* 76 U.S.App.D.C. 179, 130 F.2d 442 (1942); *Kubacki v. Metropolitan Life Insurance Company,* 193 Pa.Super. 138, 164 A.2d 48 (1960). In delineating for the jury those portions of the article which were appropriate for their consideration we believe that we exercised proper discretion in preserving the relevant portions of the article and excising the irrelevant portions which might have diverted the jury's attention to the prejudice not only of the defendant but of the general interest in orderly jury deliberations. We therefore also decline to grant a new trial on that ground.

D. *Miscellaneous Alleged Trial Errors*

1. *A Juror's Possession of a Book on Jury Duty and Our Instruction with Repect Thereto*

Unknown to us and to counsel, a book entitled *What You Need to Know for Jury Duty* was in the possession of a Mrs. Whitman, one of the jurors, when the jury retired for its deliberations. We later received a written inquiry from the jury foreperson asking whether the book could be used by the jury in its deliberations.[24] Although counsel was not present, the jury was immediately instructed as follows:

The Court: . . . . I will instruct you that your guide for your deliberations should be the evidence that you heard and my charge.

I am sure it [the book] is very interesting and it might, indeed, be helpful. But the lawyers haven't seen it and haven't

read it. This sort of relates to my instruction about not talking to anybody at home and having your deliberations influenced by someone who didn't hear the evidence.

And conceptually there is still a further reason for that, that is, that if you take the advice of someone at home who didn't hear the evidence, the lawyers can't cross-examine them. You would, in essence, be considering evidence outside the courtroom that the lawyers for the parties couldn't cross-examine. Well, they can't cross-examine this book either. They haven't read it.

If I would have given it to them to read they might make some comments on it and cross-examine it and put it in perspective. This way they don't know what you are using out of it.

Mrs. Whitman, I'm sure when you are all through you will read it and maybe you will write your own book or write an article for the Fort Washington Sentinel or the Montgomery Times, the Today Magazine, for all we know. But since the lawyers haven't read it and I haven't read it and I don't know what is in it and I don't know what portion of it you may use and how that would impact upon your deliberations, I think it is better that you not use it.

I trust you, Mrs. Whitman. I'll give it back to you but I instruct you you don't use it and that you conduct your deliberations on the basis of the evidence and the law.

You may now return to your deliberations.

When counsel were present later that afternoon to receive the jury's verdict, but prior to the jury's entry into the courtroom, we told counsel of the jury's question and of our instructions to them not to make any use of the book. Without objection from any party, the jury was called in and delivered its responses to the interrogatories.

We cannot agree with the defendant that our instructions to the jury constituted

---

24. "We would like to use the book that is titled 'What You Need to Know for Jury Duty' as a

guide for our deliberations." N.T. Tenth Day 625.

prejudicial error in the conduct of the trial denying substantial justice. Indeed, we believe that the instruction was eminently proper. Nor, with counsel out of the building, was it appropriate to delay such an instruction while the jury possessed the book. In any event the defendant's counsel had the opportunity to move for mistrial when we announced, prior to the return of the jury, the events which transpired. *Cf. Chiodo v. General Waterwork Corp.*, 380 F.2d 860 (10th Cir. 1967). This counsel declined to do—presumably for the reason that he did not then believe that any damaging effects could have been produced (or, tactically, because he thought that the trial had gone well for his client and he anticipated a favorable verdict).

Defendant further complains that after our instructions to the jury we declined to seize the book from the possession of its owner, and failed to inform counsel of this fact before the jury's return. We again think that defendant's argument is unsound and that virtually no probability of prejudice to substantial rights arose. It would be only the most contumacious jury which would, after our instructions, make use of the book at issue.[25] If jury verdicts were so easily impeached the jury trial system would be paralyzed. As Judge Learned Hand observed in *Jorgensen v. York Ice Machinery Corp.*, 160 F.2d 432, 435 (2d Cir.), *cert. denied*, 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 349 (1947):

[I]t would be impracticable to impose the counsel of absolute perfection that no verdict shall stand, unless every juror has been entirely without bias, and has based his vote only upon evidence he has heard in court. It is doubtful whether more than one in a hundred verdicts would stand such a test; and although absolute justice may require as much, the impossibility of achieving it has induced judges to take a middle course, for they have recognized that the institution could not otherwise survive; they would become Penelopes forever engaged in unravelling the webs they wove. Like much else in humane affairs, its defects are so deeply enmeshed in the system that wholly to disentangle them would quite kill it.

We agree.[26]

2. *Alleged Defects in the Special Interrogatories*

 Defendant's claim that the interrogatories submitted to the jury were misleading requires some explication. In essence it is defendant's contention that the jury was given clues as to what answers would produce what results. Interrogatory 7, for instance, asks:

Has the plaintiff proved by clear and convincing evidence that Dr. Nixon intentionally told Hugh Brown that Mr. Chuy was suffering from polycythemia vera?

————— —————
Yes No

If the answer to Question 7 is no, then skip questions 8 through 11, and please inform the Marshal that you have completed your deliberations.

Defendant contends that, because the jury might have inferred that to answer "No" would have been to Chuy's disadvantage, our interrogatories were unfair. We must disagree, not only because there was no such specific objection by the defendant to the form of the interrogatories prior to their submission to the jury; *cf.* Rule 51,

---

**25.** Indeed, the jury asked our advance permission to use the book, a fact rendering it most unlikely that it would violate our instructions.

**26.** Defendant has cited to us the following cases as supporting its position. *Thomas v. Peerless Mattress Co.*, 284 F.2d 721 (4th Cir. 1960); *Stiles v. Lawrie*, 211 F.2d 188 (6th Cir. 1954); *Liggett & Myers Tobacco Co. v. Imbraguglia*, 73 F.Supp. 909 (D.Md.1947). We believe that none of the above cases supports defendant's position in this case. In *Peerless*

the court upheld the trial court's decision to grant a new trial as within its discretion where a deputy marshal had advised the jury, upon the jury's request, that the parties had a right to appeal. Notably, the jury then returned its verdict without any curative instruction. In *Stiles* the matter in the jury room was a manual relating skid marks to the speed of vehicles and again there was no instruction prior to verdict. Finally, in *Imbraguglia* the motion for new trial was *denied*.

Fed.R.Civ.P.; but because the fact that the jury might have thus inferred which answers favored plaintiff is no ground upon which to base the granting of a new trial. Rule 61, Fed.R.Civ.P. In *George v. Morgan Construction Co.*, 389 F.Supp. 253, 267 (E.D. Pa.1975), Judge Davis properly responded to a similar question as follows:

> If defendants' argument is carried to extremes, it is clear that no general verdicts, as traditionally used throughout the United States, would stand, for in cases of general verdicts, the jury is traditionally told to answer the question of the original defendants' liability to the plaintiff, and if it finds no liability, that ends the case . . . . .

Although this is not the time or place to discourse upon differences between and relative virtues of general verdicts and special interrogatories, we do note our belief that: (1) the interrogatories were appropriate; (2) the decision to employ them lies indisputably within the broad discretion of the trial judge; and (3) it would be most inappropriate to hold that such a decision to employ interrogatories once made would then be deemed to alter significantly the substantive rights of the parties.

Defendant submits that there is another serious flaw in the interrogatories (although it did not object prior to their submission to the jury), *i. e.*, that because there was no instruction at the end of the questions pertinent to liability for defamation, the jury may have included damages for injury to reputation in answering the damages question while they at the same time rejected defamation liability. Of course had we included such an instruction defendant would have correspondingly referred to that language in their claim that it was reversible error to have given the jury "clues" as to the result. We therefore emphasize that it is crucial to the orderly administration of civil justice that counsel be given the responsibility for evaluating the court's instructions and interrogatories and making the appropriate distinct objections, and that a party be denied the opportunity of taking advantage of his silence on a particular point. Counsel must aid the court during the trial in order to assure the interests of his client, and must not lie in wait, as it were, until the verdict is returned. Otherwise the resulting premium on acquiescence would often leave courts without the benefit of vigorous advocacy and therefore more prone to err. The interrogatories were proper when viewed against our instructions to the jury which we believed reasonably indicated the necessary elements of the defamation claim. (N.T. Instruction of Court 609, 10, 13.) We must therefore reject defendant's contentions with respect to the special interrogatories.[27]

### 3. *The Award of Punitive Damages*

After finding liability based upon intentional or reckless infliction of mental distress, the jury awarded to the plaintiff $10,000 in actual damages and $60,590.96 in punitive damages. Defendant in its last remaining argument urges (1) that no punitive damages can be awarded where the cause of action has as one of its elements the proof of outrageous conduct and (2) that, in any event, the punitive damages were excessive in this case.

---

**27.** Defendant also claims that giving the jury questions on damages appearing in, and clearly applicable to, the section of the Special Interrogatories marked—"II. Defamation and Infliction of Emotional Distress Claims"—misled the jury into including contract damages in the mental distress damage figure. The claimed basis for this conclusion is that the jury was confused by our charge that they not construe or interpret the written contracts, *see* note 8 *supra*, and therefore believed that Don Chuy had lost his contract claim. While this is a truly imaginative assault, we believe that given the numerous questions pertaining to the contract claim under the heading "I. Contract Claim" the jury was not at all confused. The defendant has presented to us a theory that the $60,590.96 punitive damage award is but an attempt to give Chuy his "contract damages" plus $590.96, which the defendant indicates is the amount of interest owing the Eagles on Chuy's unpaid $15,000 loan, given at the time Chuy joined the Eagles. As we have said, we do not think the jury was confused about the contract damage and we will not permit the jury to be impeached because of speculation on its method of computing punitive damages.

Because the jury found that Dr. Nixon intentionally or recklessly inflicted mental distress upon Donald Chuy, this case fails squarely within the class of cases involving a wrongful motive and outrageous conduct. *See Chambers v. Montgomery*, 411 Pa. 339, 192 A.2d 355 (1963); *Hughes v. Babcock*, 349 Pa. 475, 37 A.2d 551 (1944). *Chambers* states that the jury may consider the recklessness of the defendants' conduct as well as the relationship of the defendant to the plaintiff. *Id.*, 192 A.2d at 358. Having found such conduct to be outrageous, the jury was entitled, we think, to award punitive damages in order to assure that the defendant "will be punished and deterred" from repeating such conduct in the future. *Rosenbloom v. Metromedia*, 289 F.Supp. 737, 749, *rev'd on other grounds*, 415 F.2d 892 (1969), *aff'd*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); *see Thomas v. American Cystoscope Makers, Inc.*, 414 F.Supp. 255, 263 (E.D.Pa.1976).[28]

We also believe that the punitive damages awarded by the jury were not excessive, even in view of the relatively low compensatory damages awarded. We cannot say that the jury's award was an unreasonable one or one based on prejudice; rather, we believe that the size of the award permissibly reflects a concern that the kind of conduct found to have taken place requires a punishment which will chill the recurrence of similar conduct.

Thus, defendant's motions to the extent they are based upon the miscellaneous grounds recited in this section are denied.

---

**28.** The discussion in *Hughes v. Babcock*, that a plaintiff recovering compensatory damages for the use of unreasonable force in his ejection from a public place may not also recover punitive damages unless the actionable conduct was "more than unreasonable," should have no application in this context. Suffice it to say that the conduct in this case was found to be outrageous, and thus there is a strong need for punitive damages, not as a specific compensatory right of a plaintiff, but as a deterrent. We do not take *Hughes* to mean that such a traditionally cognizable need must be ignored.